**STATE of Missouri, Respondent,**

v.

**Robert SIMMONS, Appellant.**

**No. WD 68948.**

Missouri Court of Appeals,
Western District.

Dec. 16, 2008.

Shaun Mackelprang, Jefferson City, MO, for Respondent.

Nancy McKerrow, Columbia, MO, for Appellant.

Before VICTOR C. HOWARD, P.J., JOSEPH M. ELLIS, Judge and ALOK AHUJA, Judge.

VICTOR C. HOWARD, Presiding Judge.

Robert Simmons appeals the trial court's judgment upon a jury verdict finding him guilty of one count of unlawful merchandising practices in violation of the Missouri Merchandising Practices Act ("MMPA") and imposing a six month sentence in the county jail. In two of his four points on appeal, Simmons claims that the trial court erred in denying his motion for acquittal at the close of all evidence. In his two remaining points, Simmons claims that the trial court abused its discretion in denying his motion for severance and in admitting the State's exhibits consisting of sale barn records. Simmons's four points are denied and the judgment is affirmed.

## Factual and Procedural Background

In June 2006, Robert Simmons was charged with five counts of unlawful merchandising practices pursuant to section 407.020, RSMo Cum.Supp.2006.[1] The Office of the Attorney General prosecuted the case against Simmons. The charges arose from allegations that Simmons had made misrepresentations in the course of selling cattle to Randy Kell and Don Collins.

Randy Kell, a cattle producer who lives in Raymondville, Missouri, responded to an advertisement for cattle that Simmons had placed in a publication called the Ad Tracker. Although Kell was not interested in the cattle mentioned in the ad, Simmons agreed to meet with Kell and show him other cows. Kell and Simmons met near Boonville, Missouri, on October 13, 2003, and Simmons showed Kell cattle in several different pastures. Kell claims that while showing each group of cows, Simmons stated that all the cows had raised at least one set of calves and that the cattle had been on the farm for at least one or two calf crops.

After seeing the cows, Kell agreed to pay Simmons $304,500.00 in exchange for 396 cows. Kell gave Simmons a check for $10,000.00 as a down payment, and the parties agreed that the balance of the price would be paid on the date of delivery. At that time, Simmons informed Kell that he had a partner, but still told Kell to make the check out to only Simmons. Kell and Simmons decided they would meet at a truck stop at 7:00 a.m. on October 23, 2003, prior to the delivery of the cows. Kell testified that Simmons told him he would have an opportunity to see the cows once more before they were delivered to Kell's farm.

On the morning of October 23, Kell arrived at the truck stop at 4:30 a.m. He drove past each area where Simmons had shown him the cows, but the cows were no longer at those locations. Kell went back to the truck stop at 7:00 a.m., but Simmons had not yet arrived. After several attempts, Kell was able to reach Simmons by phone at 7:45 a.m. Simmons stated that he had been detained but would arrive at the truck stop soon. When Simmons appeared at the truck stop at 8:00 a.m., Kell said he was ready to see the cows before they were delivered. Simmons told Kell that two trucks had already been loaded and sent to Kell's farm. Because Kell was the

---

1. Three of the counts were dismissed by the State on the first day of trial.

only one who knew where the cows were to be pastured when they reached his farm, he paid Simmons the remaining $294,500 and left for his farm without waiting to see the other cows before they were loaded.

As soon as the first cows were unloaded, Kell noticed that they were not the same cows Simmons had shown him. Kell later spoke with Simmons on the phone, asking Simmons to be present when Kell had the cows examined by a veterinarian. After this, Kell began having trouble reaching Simmons by phone. In December, Kell sold the cows at a stockyard in Cuba, Missouri.

Don Collins, who was also involved in the cattle business, had a similar experience with Simmons. After Collins responded to an advertisement placed by Simmons, Collins and Simmons met to look at cows in June 2004. Simmons showed Collins cows at several locations, and Collins alleges that Simmons told him most of the cows were "home raised." Collins bought 189 cows from Simmons and gave Simmons checks totaling $238,500.00. During the six months after the cows were delivered to Collins, some of the cows died, and the remaining cows would not calve.

Both Kell and Collins filed complaints against Simmons with the Office of the Attorney General. An investigation of various sale barn records revealed that 152 of the cows Kell received had been sold at Missouri sale barns less than three months before he received them. Thirty-nine of those cows had been purchased from a Missouri sale barn between the time Kell viewed the cows and the day the cows were delivered to Kell. Simmons was charged with violating the MMPA, and two counts were tried before the jury. The State alleged in each count that Simmons had sold cows that did not conform to his representations and that Simmons had made the misrepresentations with the in-tent to defraud Kell and Collins. The first count pertained only to the representations made to Kell, and the second count involved only the representations made to Collins.

During the State's investigation and at trial, Simmons maintained that the cows he had sold were owned by Mitch Leonard. Simmons said that he relied on Leonard's representations, and then relayed them to buyers while negotiating sales. Simmons also stated that his only role was to advertise cattle, show them to prospective buyers, and negotiate sales. He claimed he was not involved in the loading and delivery of the cows he sold. At trial, Simmons testified that he did not tell Kell that the cows had produced at least one generation of calves or tell Collins that the cows were home raised.

The jury found Simmons guilty of unlawful merchandising practices in connection with the sale of cows to Kell, but acquitted Simmons on the second count involving Collins. The jury recommended a jail term of six months and a fine to be determined by the court. On October 11, 2007, the trial court sentenced Simmons to six months in the county jail and assessed a fine of $3,000.00. This appeal by Simmons followed.

## Point I

In his first point on appeal, Simmons contends that the trial court erred in denying his motion for acquittal at the close of all the evidence. He claims that the trial court should have granted his motion because the evidence was insufficient to support a finding that Simmons acted with the intent to defraud Kell.

### A. Standard of Review

In reviewing a challenge to the sufficiency of the evidence, an appellate court is

"limited to a determination of whether the State presented sufficient evidence from which a reasonable trier of fact could have found [the defendant] guilty beyond a reasonable doubt." *State v. Buhr*, 169 S.W.3d 170, 175 (Mo.App. W.D.2005). The appellate court must view the evidence and all reasonable inferences from the evidence in the light most favorable to the verdict and disregard any evidence and inferences to the contrary. *Id.* A reviewing court "neither weighs the evidence, nor determines the credibility of witnesses." *Id.* (citation omitted). It is within the jury's discretion to "believe all, some or none of a witness's testimony in arriving at a verdict." *State v. Gomez*, 863 S.W.2d 652, 655 (Mo.App. W.D.1993).

### B. Analysis

■ Under MMPA section 407.020.1, "[t]he act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce ... is declared to be an unlawful practice." Furthermore, section 407.020.3 characterizes such an act as criminal by declaring that "[a]ny person who willfully and knowingly engages in any act, use, employment or practice declared to be unlawful by this section with the intent to defraud shall be guilty of a class D felony."

The issue presented by Simmons is whether there was sufficient evidence from which a reasonable trier of fact could have found Simmons guilty beyond a reasonable doubt of making a misrepresentation with the intent to defraud Kell. Simmons argues that the evidence was insufficient to prove that he intended to defraud Kell because Simmons was not involved in loading the cows for delivery, and he merely conveyed Leonard's representations about the cows without knowing that they were false. This argument ignores both the standard of review applicable to this point and the jury's right to disbelieve Simmons's testimony. The evidence and all reasonable inferences drawn therefrom, viewed in the light most favorable to the verdict, demonstrate that there was sufficient evidence for a reasonable jury to find Simmons guilty.

The evidence at trial showed that Simmons told Kell that all of the cows Kell was going to purchase had raised at least one generation of calves while on the farm. Because the sale barn records showed that some of the cows Kell purchased had been recently acquired, those cows could not have been on the farm for the length of time claimed by Simmons. In addition, there was sufficient evidence regarding the circumstances of the sale from which a reasonable jury could conclude beyond a reasonable doubt that Simmons willfully and knowingly made the misrepresentation with the intent to defraud Kell.

Although Simmons mentioned having a partner when Kell made the down payment, Simmons never told Kell that the cows belonged to Leonard or that Simmons was relying on information from Leonard rather than his own knowledge. For both the down payment and the balance of the purchase price, Simmons told Kell to make the check out solely to Simmons. The evidence also shows that Simmons and Kell agreed to meet at 7:00 a.m. on the day of delivery and that Kell would have an opportunity at that time to see the cows before they were sent to his farm. Simmons did not arrive at 7:00 a.m., and Kell, after several attempts, reached Simmons by phone at 7:45 a.m. Simmons had been detained for unknown reasons and met Kell at 8:00 a.m.

When Simmons arrived at the truck stop, Kell informed him that he was ready to see the cows. While Simmons claims he had nothing to do with the loading and delivery of the cows, he was aware that two loads of cows had left for Kell's farm 30 minutes earlier. Because only Kell knew where the cattle were to be placed on the farm, he felt compelled to go to his farm in order to be present at the time of delivery. These circumstances prevented Kell from seeing the cows that had been loaded on the first two trucks and from seeing the remaining cows that would be loaded later. When Kell began receiving delivery of the cattle on his farm, he was given invoices that indicated that Simmons had shipped the cattle.

In the following weeks, Kell had difficulty reaching Simmons by phone. When Kell wanted to discuss the results of an examination of the cows by a veterinarian, Kell called from the veterinarian's home because he was unable to reach Simmons when calling from his home phone. Although Kell was ultimately able to reach Simmons from the veterinarian's phone, Simmons never came to Kell's farm to inspect the cows. Finally, in November 2003, Kell drove to the Howard County Sheriff's Office to file a complaint against Simmons. On his way there, Kell drove by the pastures he had visited with Simmons on October 13 and saw that the cows he had looked at were still in the pastures. About a week after filing the complaint, Kell drove by the same pastures, and the cows were no longer there.

Under these circumstances, there was sufficient evidence from which a reasonable jury could find that when Simmons told Kell the cows Kell was purchasing had raised at least one generation of calves on the farm, Simmons was willfully and knowingly making a misrepresentation with the intent to defraud Kell. Therefore, the trial court did not err in denying Simmons's motion for acquittal. Point one is denied.

## Point II

In his second point on appeal, Simmons contends that the trial court abused its discretion in denying his motion for severance of Count I from Count II. He claims that because the evidence presented on Count II, the Collins transaction, suggested that Simmons had a propensity to misrepresent the cows he sold, he was substantially prejudiced by the trial court's failure to sever the two counts.

### A. Standard of Review

Review of a claim involving a trial court's failure to sever charges entails a two-step analysis. *State v. Kelly,* 956 S.W.2d 922, 925 (Mo.App. W.D.1997). The reviewing court must first determine whether joinder of the charges was proper as a matter of law.[2] *Id.* If joinder was proper, the court must next decide whether the trial court abused its discretion by failing to sever the charges. *Id.* Upon a finding that joinder was proper, the trial court's decision will not be reversed "unless there is both a showing of abuse of discretion and a clear showing of prejudice." *State v. Meder,* 870 S.W.2d 824, 829 (Mo.App. W.D.1993).

### B. Analysis

■ Rule 24.07 provides:

An offense shall be ordered to be tried separately only if:

(a) A party files a written motion requesting a separate trial of the offense;

---

2. Simmons concedes that joinder of the two counts was proper as a matter of law. Therefore, we only address the issue of whether the trial court abused its discretion in denying Simmons's motion for severance.

(b) A party makes a particularized showing of substantial prejudice if the offense is not tried separately; and

(c) The court finds the existence of a bias or discrimination against the party that requires a separate trial of the offense.

Simmons asserts that he was substantially prejudiced in that evidence of the Collins transaction would have been inadmissible if the count concerning Kell had been tried separately. He further argues that the fact that he was acquitted on Count II does not conclusively show that no prejudice resulted from trying the two counts together.

In determining whether a party would be prejudiced if multiple offenses are not tried separately, a court should consider several factors, including "the number of offenses charged, the complexity of the evidence offered, and whether the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense." *State v. Conley*, 873 S.W.2d 233, 238 (Mo. banc 1994) (quoting *State v. McCrary*, 621 S.W.2d 266, 272 (Mo. banc 1981)). Another factor relevant to evaluating prejudice "is whether evidence of separate crimes would have been inadmissible propensity evidence had the two crimes not been joined." *Id.* However, even if the evidence would have been inadmissible, prejudice resulting from joinder of the offenses "may be overcome where the evidence with regard to each crime is sufficiently simple and distinct to mitigate the risks of joinder." *Id.*

In this case, there were only two counts, and each count dealt with a specific misrepresentation allegedly made by Simmons. The first count alleged that Simmons told Kell that all the cows had raised at least one generation of calves while on the farm. The second count alleged that Simmons told Collins that most of the cows

on the farm were home raised. Kell and Collins each testified about their experiences with Simmons. Although the situations had similarities, the testimony was uncomplicated and pertained to the distinct representations that were made to each of them. Furthermore, the court told the jury that Simmons was charged with a separate offense in each count and instructed the jury to consider each count separately. The potential prejudice resulting from the joinder of the offenses was sufficiently mitigated by the distinctness and simplicity of the evidence offered on each count.

Next, Simmons argues that his acquittal on Count II does not establish that he was not prejudiced by the trial court's failure to sever the counts. In support of his position, Simmons cites *State v. Brown*, 954 S.W.2d 396 (Mo.App. E.D.1997). In that case, the jury found the defendant guilty on one count, but was unable to reach a decision on two other counts. The court found that it could not tell, without speculating, to what extent the evidence on the other two counts influenced the jury. *Id.* at 398. However, as the State points out, *Brown* was a case in which the court first determined that joinder was improper. *Id.* In that context, the reviewing court may find that evidence of the improperly joined crimes did not prejudice the defendant only if the court finds "beyond doubt that the tainted evidence did not affect the jury in its fact-finding process." *Id.* This standard is clearly dissimilar to the relevant standard in a case of proper joinder, and, thus, *Brown* does not preclude this court from finding that Simmons was not substantially prejudiced by the trial court's failure to sever the counts.

Additionally, there are numerous cases in which Missouri courts have noted that when a jury finds the defendant guilty of one count but acquits him of another

count, it signifies that the jury was able to distinguish the evidence and consider the offenses separately. *See, e.g., State v. Johnson,* 231 S.W.3d 870, 875–76 (Mo.App. S.D.2007); *State v. Butchee,* 255 S.W.3d 548, 552 (Mo.App. S.D.2008); *State v. Chambers,* 234 S.W.3d 501, 509 (Mo.App. E.D.2007). The record in this case indicates that the evidence was uncomplicated, the jury was instructed to consider each count separately, and the jury demonstrated its ability to distinguish the evidence by convicting Simmons of one count of unlawful merchandising practices but acquitting him on the other count. Therefore, we find that the trial court did not abuse its discretion in denying Simmons's motion for severance and that Simmons failed to make a clear showing of substantial prejudice. Point two is denied.

## Point III

In his third point on appeal, Simmons contends that the trial court abused its discretion in admitting the State's Exhibits 9, 10, 12–14, and 16–24, which were all records from Missouri sale barns. He claims that the exhibits were not admissible as business records under section 490.692, RSMo 2000, because the records were attached to copies of affidavits from the custodians of records, rather than the original affidavits. Simmons argues that he was prejudiced by the admission of the exhibits because one of the State's witnesses used the sale barn records to support his conclusion that many of the cows Kell received had been purchased less than three months before they were delivered to Kell.

### A. Standard of Review

The trial court has broad discretion to admit or exclude evidence, and its ruling will be reversed "only upon a showing that the trial court clearly abused its discre-

tion." *State v. Cravens,* 132 S.W.3d 919, 930 (Mo.App. S.D.2004). Similarly, whether a sufficient foundation has been laid to warrant the admission of evidence is left to the trial court's sound discretion. *Id.* at 929. The trial court abuses its discretion when "its ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.* at 930.

### B. Analysis

■ Under section 490.692.1, business records, or copies of business records, are admissible upon the affidavit of the custodian of records stating that the records attached to the affidavit were kept as required by section 490.680, RSMo 2000. Section 490.692.2 further requires that all parties must be served with copies of the records and affidavit at least seven days before trial begins, and section 490.692.3 provides an example of the form the affidavit may take and the content it may include.

When the State offered the exhibits at issue, Simmons objected on the basis that the records were accompanied by copies of the affidavits required by section 490.692, rather than the original affidavits. The prosecuting attorney informed the court that the original affidavits had been filed with the court without any records attached and that copies of the affidavits were now attached to the exhibits. Although the prosecutor did not provide a satisfactory explanation as to why this had occurred, he assured the court that the original affidavits were at one time attached to the records the State sought to introduce and that the copies were exact duplicates of the original affidavits. Additionally, the original affidavits were in the trial court's file, and the court had an opportunity to compare the originals with

the copies. The court determined that the copies appeared to match the originals and ruled that the exhibits were admissible.

Although we do not condone the prosecutor's method of filing the original affidavits separately from the records and then attaching copies of the affidavits to the exhibits, we are unable to find that the trial court's ruling was against the logic of the circumstances or indicated a lack of careful consideration. The record shows that the trial court heard extensive arguments on this issue both during trial and before it ruled on Simmons's motion for a new trial. The court indicated that it was concerned about the manner in which the prosecutor handled the exhibits, but ultimately found the copies of the affidavits and the records to which they were attached to be reliable. Simmons's attorney had received copies of the records and affidavits in compliance with section 490.692.2, and has pointed to no authenticity or admissibility concerns regarding the underlying records themselves, or any variance between the original affidavits and the copies offered in evidence. The affidavits were in the proper form and included the correct content, and the original affidavits, which were in the possession of the court, matched the copies offered into evidence. Under this combination of circumstances, we cannot say that the trial court abused its discretion in admitting the exhibits. Point three is denied.

## Point IV

In his final point on appeal, Simmons asserts that the trial court erred in proceeding on the charges in the State's amended information because the MMPA does not apply to this case. Simmons argues that the MMPA was enacted to protect end consumers in public transactions, and that because Simmons's sale of cattle to Kell was a private transaction between two businessmen, the MMPA is inapplicable.

### A. Standard of Review

Whether section 407.020 applies to the transaction between Simmons and Kell is a question of statutory interpretation. "Statutory interpretation is a question of law, and questions of law are reviewed *de novo*." *Goodwin v. Carroll County*, 250 S.W.3d 427, 428 (Mo.App. W.D.2008). The primary objective of statutory interpretation is to ascertain the intent of the legislature and give effect to that intent as it is reflected in the plain language of the statute. *State ex rel. Young v. Wood*, 254 S.W.3d 871, 872–73 (Mo. banc 2008). When the language of the statute is unambiguous, a court must give effect to the language as written. *Id.* at 873. " 'A court may not add words by implication to a statute that is clear and unambiguous.' " *Id.* (quoting *Asbury v. Lombardi*, 846 S.W.2d 196, 202 n. 9 (Mo. banc 1993)).

### B. Analysis

As noted in our analysis of Simmons's first point, an unlawful practice under MMPA section 407.020.1 includes the "use or employment by any person of any ... misrepresentation ... of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." The MMPA further provides that any person who willfully and knowingly engages in an unlawful practice under section 407.020 with the intent to defraud "shall be guilty of a class D felony." § 407.020.3

In addition to these provisions, several definitions under the MMPA are relevant to our analysis. As used in section 407.020, "merchandise" is defined as "any objects, wares, goods, commodities, intangibles, real estate or services."

§ 407.010(4), RSMo 2000. "Person" is defined as "any natural person or his legal representative, partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign, company, foundation, trust, business entity or association, and any agent, employee, salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." § 407.010(5). Finally, "sale" is defined as "any sale, lease, offer for sale or lease, or attempt to sell or lease merchandise for cash or on credit." § 407.010(6). Simmons, whether he was acting in his individual capacity or as the agent or partner of Leonard, falls within the parameters of a "person" as defined by section 407.010(4). Furthermore, the cattle transaction between Simmons and Kell constituted a "sale" of "merchandise" as contemplated by the statutory definitions. Therefore, Simmons's side of the transaction is clearly covered by the MMPA.

The remaining question is whether Kell is the type of individual that the MMPA was enacted to protect. Missouri courts have noted that the MMPA "was enacted to preserve fundamental honesty, fair play, and right dealings in public transactions." *See, e.g., Scott v. Blue Springs Ford Sales, Inc.*, 215 S.W.3d 145, 160 (Mo.App. W.D. 2006). Simmons argues that this purpose precludes the application of the MMPA to the facts of this case because (1) Kell was in the business of buying and selling cattle and was, therefore, not an "end consumer" of the merchandise, and (2) the transaction between Kell and Simmons was private rather than public.

The text of sections 407.010 and 407.020 does not define or include the terms "consumer" or "end consumer" or distinguish between "private" and "public" transactions. Even if the term "consumer" can be read into section 407.020, the Missouri Code of State Regulations provides a definition for the term "consumer" that is applicable in this context. *See* Mo.Code Regs. Ann. tit. 15, § 60–8.010(1)(B) (1996). The regulation provides that "[u]nless inconsistent with the definitions provided in Chapter 407, RSMo, . . . [c]onsumer shall include any person (as defined in section 407.010.5, RSMo) who purchases, may purchase or is solicited for purchase of merchandise." *Id.* As sections 407.010 and 407.020 do not provide any definition, let alone an inconsistent definition, of the term "consumer," Kell is a consumer as defined by section 60–8.010(1)(B).

In addition to the fact that the relevant statutes do not define or contain the terms Simmons seeks to read into them, the cases cited by Simmons are inapposite in that they involve civil claims brought under section 407.025, RSMo 2000, rather than actions prosecuted by the Attorney General pursuant to section 407.020. Section 407.025 provides for a private civil cause of action under the MMPA but requires that the person purchased the merchandise "primarily for personal, family or household purposes." Simmons argues that this qualification provides support for his argument that section 407.020 only applies to end consumers, when in fact, the language of section 407.025 frustrates his argument. The absence of similar language in the MMPA's criminal provision indicates that the legislature did not intend to limit the statute's protection to only those who purchased merchandise primarily for personal, family, or household purposes.

Accordingly, because the terms suggested by Simmons do not appear in the relevant statutes and Simmons's arguments based on the MMPA's civil statute have no bearing on the interpretation of the criminal act defined in section 407.020.3, we find that the MMPA applies to the facts of this case. Point four is denied.

The judgment of the trial court is affirmed.

All concur.