Corrected – October 27, 2021



**In the**
**Missouri Court of Appeals**
**Western District**

| | |
|---|---|
| **STATE OF MISSOURI,** | |
| **Respondent,** | **WD83010** |
| **v.** | **OPINION FILED:** |
| **ANTOINE L ELLIS,** | **OCTOBER 26, 2021** |
| **Appellant.** | |

**Appeal from the Circuit Court of Jackson County, Missouri**
**The Honorable Charles H. McKenzie, Judge**

**Before Division Two: Mark D. Pfeiffer, Presiding Judge, Alok Ahuja, Judge,**
**Anthony Rex Gabbert, Judge**

Antoine Ellis appeals his conviction after jury trial for two counts of statutory rape in the first degree and one count of enticement of a child. He raises four points on appeal claiming that the trial court erred in admitting various evidence and testimony. The judgment is affirmed.

## Facts

Ellis was charged with the unclassified felony of first-degree statutory rape, section 566.032, in Count I, for knowingly having sexual intercourse with C.S. ("Victim"),[1] a child less than 14 years old, on or between June 14, 2015, and January 31, 2016; the unclassified felony of

---

[1] We refer to the victim and family members by generic terms to protect the victim's identity pursuant to section 595.226.

first-degree statutory rape, section 566.032,[2] in Count II, for knowingly having sexual intercourse with Victim, a child less than 14 years old, on or between January 1, 2016, and January 31, 2016; and the unclassified felony of enticement of a child, section 566.151, in Count III, for enticing Victim, who was less than 14 years old, by sending her sexually explicit text messages, on or between January 1, 2016, and March 23, 2016, for the purpose of engaging in sexual conduct with her.

In the light most favorable to the verdict,[3] the following evidence was presented at trial: Victim was born in 2002. She first met Ellis and his girlfriend ("Girlfriend") when she was 12 years old. Ellis was friends with Victim's stepfather ("Stepfather"). Ellis and Girlfriend were treated like family and visited every weekend. Victim's mother ("Mother") testified that Victim and Ellis claimed they were best friends which she thought was "kind of strange."

Ellis first touched Victim in a sexual manner by walking to her as if to give her a hug and touching her pubic area in a groping manner. She did not tell anyone because "[h]e's just like family and maybe he won't do it again." Victim got a cell phone, and Ellis asked for her phone number so that he could check up on her. Ellis began to text Victim about school and to ask how she was doing.

Victim celebrated her thirteenth birthday in June 2015 with her family, Ellis, and Girlfriend. Shortly thereafter, Victim and her family moved to a new home. Ellis and Girlfriend celebrated the Fourth of July with Victim's family. They also joined Victim's family on a trip to Florida at

---

[2] All statutory references are to RSMo 2000 as supplemented through the dates of the offenses in June 2015 through March 2016 unless otherwise indicated.

[3] "We view the facts in the light most favorable to the verdict." *State v. Bush*, 372 S.W.3d 65, 67 n.2 (Mo. App. W.D. 2012) (internal quotation marks omitted).

the end of July 2015. During this time, Ellis would touch Victim's butt and breasts while Victim was doing things around the house.

In the middle of July, Victim was home with her family, Ellis, and Girlfriend. Victim was trying on dresses Mother had bought for her. Victim went back to her room, and Ellis acted like he was going to the bathroom. Ellis went into Victim's bedroom, told her to be quiet, and pushed her onto the bed. He told Victim he loved her, put a condom on his penis, put a pillow over Victim's face, and stuck his penis into her vagina. Ellis told Victim to be quiet and that he would hurt her if she told anyone. Victim went into the bathroom to clean herself up before returning to the living room. Victim testified she had never had sexual intercourse before this encounter. Mother testified that Victim took a little bit longer to come out after trying on dresses but Mother assumed Victim was just putting the clothes away.

Ellis had intercourse with Victim a second time at some point after Stepfather moved out of the house around December 22, 2015. He came to the home while Victim was getting ready for school. Mother was at work, and Victim was home alone. Ellis told Victim that Girlfriend was in jail. He said he needed to talk to Victim and took her to her bedroom. He made Victim perform oral sex on him. He then put Victim on the bed, put a condom on his penis, and put his penis in Victim's vagina. Ellis told Victim to keep quiet about the sexual encounters.

After Victim and Ellis had sexual intercourse, the messages they exchanged began to change. Ellis told Victim he loved her, he missed her, he wanted to marry her, and he wanted her to have his baby. They texted about their sexual encounters. Ellis also called Victim a lot. They exchanged messages for months. Phone records indicate that between January 14, 2016 and February 20, 2016, they exchanged over 6,000 text messages and phone calls lasting as long as 243 minutes.

3

Victim testified she was confronted about the messages between Ellis and herself several times. Mother received a phone call from Girlfriend in January 2016 which prompted Mother to start looking into Victim's phone records. Stepfather testified he got into a fight with Ellis after seeing on Ellis' phone that he had been texting Victim. When Mother confronted Victim, Victim deleted all of the messages. Victim testified she did not tell Mother what was going on because she was scared. Mother prohibited Victim from downloading apps like Facebook and Snapchat.

On February 21, 2016, Girlfriend again brought it to Stepfather's attention that Ellis was sending sexually explicit messages to Victim. Stepfather reached out to Mother. Victim again deleted the messages when confronted. She testified she was scared of fighting with Mother and everybody over what had happened. Mother went to Ellis and Girlfriend's residence and found Kansas City police already there. Mother was advised to file a report with the Independence Police Department because Victim lived in Independence.

Ellis told Victim they could send messages to each other using an Xbox. Victim used a tablet and an app called TextNow to communicate with Ellis using a number he sent her through the Xbox. Victim testified that Girlfriend confronted Victim through the messages, telling Victim that Ellis was in a relationship. Girlfriend called Mother and told her to get Victim's device. Mother got the tablet while Victim was sleeping and saw "very explicit" messages.

On March 23, 2016, Mother, Stepfather, and Girlfriend went to the police station and reported that messages of a sexual nature had been sent to Victim. They brought the tablet which contained some of the sexually explicit messages. Mother, Stepfather, and Girlfriend were cooperative with the investigation.

Sergeant Cranston used the tablet to take screenshots of the messages. He saved those screenshots to the police department's network drive. Printouts of the complete conversation

4

contained in the screenshots consisted of 28 pages of approximately 300 messages between March 21, 2016 and March 23, 2016.

Victim testified that after the messages were discovered, she repeatedly denied that she and Ellis had ever had any sexual contact because she was scared of Ellis and Mother. Victim first disclosed the sexual contact in September 2018 because she knew Ellis could not get to her and she felt safer. A forensic interviewer testified at trial regarding the frequency of and reasons for delayed disclosures by children.

Ellis wore an ankle monitor during the time he interacted with Victim.[4] Deborah Maguire,[5] a probation and parole officer, testified that Ellis was on lifetime supervision and had a GPS monitor.[6] The GPS monitoring program showed that Ellis was at Victim's house many times, including January 27 and January 28, 2016, at approximately 6:47 and 6:48 a.m.

Ellis called a digital forensics specialist to testify as part of his defense. The specialist testified that the data extractions performed on Victim's tablet had been flawed. The specialist admitted that the accuracy of the data recovered, including the screenshots of the messages, was unaffected. Ellis also presented the theory that Stepfather was the person sending Victim sexually explicit messages and having sexual intercourse with Victim.

---

[4] On September 7, 2007, Ellis pleaded guilty in St. Charles County to two counts of first-degree statutory rape for inserting his penis into the vagina of a 12 year old girl on February 1, 2007 and February 10, 2007, and to first-degree statutory sodomy for placing his penis into her anus on February 10, 2007. Ellis was 20 years old at the time of the offenses.

[5] The probation and parole officer is referred to as Deborah McGuire and Deborah Maguire in the record before this court. Both parties refer to her as Deborah Maguire in their briefs.

[6] Section 217.735.4 provides that "[a] mandatory condition of lifetime supervision of an offender under this section is that the offender be electronically monitored. Electronic monitoring shall be based on a global positioning system or other technology that identifies and records the offender's location at all times."

The jury found Ellis guilty of all three counts. Ellis was sentenced to life imprisonment without parole for Count I, life imprisonment without parole for Count II, and fifteen years imprisonment for Count III. Counts I and II were ordered to run consecutively, and Count III was ordered to run concurrently. This appeal follows.

**Standard of Review**

"The circuit court has broad discretion to admit or exclude evidence during a criminal trial, and error occurs only when there is a clear abuse of this discretion." *State v. Loper*, 609 S.W.3d 725, 731 (Mo. banc 2020) (internal quotation marks omitted). "An abuse of discretion occurs only if the circuit court's ruling admitting or excluding evidence is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (internal quotation marks omitted). "This Court will reverse the [circuit] court's decision only if there is a reasonable probability that the error affected the outcome of the trial or deprived the defendant of a fair trial." *Id.* (internal quotation marks omitted).

Ellis did not preserve an objection to one of the evidentiary rulings challenged in Point IV. "When defendants have not preserved their claims of evidentiary error, this Court may exercise its discretion to review the claim for plain error." *Id.* (citing Rule 30.20). "[T]his Court will not review a claim for plain error unless the claimed error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted." *Id.* (internal quotation marks omitted).

Questions of statutory interpretation are determined *de novo*. *State v. Knox*, 604 S.W.3d 316, 320 (Mo. banc 2020). "The primary rule of statutory interpretation is to give effect to the

6

legislative intent as reflected in the plain language of the statute." *Id*. (internal quotation marks omitted).

**Point I**

In his first point on appeal, Ellis claims the trial court abused its discretion in admitting the testimony of Deborah Maguire and Exhibit 29 regarding Ellis' specific location at certain dates and times. He claims that Maguire was not qualified to give this testimony because she did not know how the GPS technology worked or whether its results were accurate. Ellis argues that expert testimony was required to support a foundation for the admission of the results of the GPS tracking. He argues that there is a reasonable probability that the trial court's error affected the outcome of the trial because it corroborated Victim's testimony.

At trial, Maguire testified that she had been a probation and parole officer for almost seven years. Maguire used a system called BI Total Access. That is a monitoring company that tracks the GPS monitoring for the Department of Corrections. Maguire testified that she used the BI monitoring system for approximately four years. She used it to track individuals who are on GPS to ensure that they are complying with applicable curfews. She receives an alert of an individual violating their curfew or if they cut their ankle monitor off. Maguire uses the BI monitoring system as a part of her job. She relies on it for many aspects of her job. Over her four years of using the BI monitoring program, Maguire has monitored, at a minimum, twenty or thirty individuals. She has used the monitoring program two to three times per week over the four year period.

Maguire supervised Ellis from September 2015 through January 2017 and again from May 2017 through August 2017. She was asked to determine Ellis' locations for the criminal case against him. She prepared a document with dates and addresses, including dates when Ellis was at Victim's house.

Maguire also took screenshots from the BI Total Access System showing Ellis was located at Victim's house. She testified that the dots on the screenshot are from when Ellis' GPS in his monitoring bracelet hits the satellite. The program allowed Maguire to see the location where the GPS pinged as well as the timing of the ping. The longer Ellis stayed at one location, the more pings appeared at that location resulting in more dots on the screen. Maguire is able to track dot to dot on the screen and can see when a dot first appears at a location.

Maguire brought to court the laptop she would use in order to locate Ellis on the BI mapping system. She went through the entire process of accessing Ellis' information in the BI Total Access System in front of the jury. The jury saw how the program started out as a Google Map view. Upon zooming in, individual dots become visible for the date and time period selected. She also showed how pressing the play button shows how the dots moved over a period of time.

On cross-examination, Maguire was asked why some of the dots were different colors and different sizes. She stated that she did not know why the dots were different sizes. Defense counsel asked: "Because all you do is you plug something in the computer and it tells you where someone's located?" and Maguire answered "Yes."

Testimony at trial corroborated some of the data from the GPS tracking system. Mother testified that Ellis came to her house on the Fourth of July and the records reflected that. She testified that Ellis came over to the house for Christmas and the records reflect that Ellis was there on December 24, 2015. Mother testified that Ellis did not come over to the house after the July 2015 Florida trip, and the GPS records reflect that Ellis did not go to the house between July and December 2015. Victim testified that the second time she had sexual contact with Ellis occurred

8

at some point after December 2015 before school began. The records reflected that Ellis was at the house January 27, 2016 at 6:47 a.m. and on January 28, 2016 at 6:48 a.m.[7]

Ellis maintains that Maguire was not an expert witness and was not called to testify about the accuracy of the GPS readings. He relies on brief pretrial proceedings where the prosecutor stated about Maguire:

> Judge, this witness is not testifying as an expert. I don't expect her to testify about the accuracy of the data only that she used this data for multiple years. It was a job requirement. She was monitoring Mr. Ellis because he was on lifetime GPS monitoring and she used this program on a daily basis, relies on this program as part of her job in monitoring these individuals. She can testify that her personal knowledge of having looked at these particular dates that it places him at the victim's address. I think because she's not testifying as an expert [defense counsel's] concerns are -- only go to the weight of the evidence and not to its admissibility.

Defense counsel protested that if the State did not want to use the tracking information for its accuracy then it was more prejudicial than probative. The prosecutor clarified:

> I think I might have misstated. I don't mean that she's going to testify that the data is not accurate. I just mean the details in terms of how often the satellite pings the GPS and things like that. I don't expect her to testify regarding that.

In *State v. Williams*, 427 S.W.3d 259, 265 (Mo. App. E.D. 2014), the defendant challenged the testimony of a probation and parole officer regarding an electronic monitoring system. The officer had 14 years' experience as a probation and parole officer for the State of Missouri. *Id*. "[S]he received two days of training on interpreting the electronic monitoring system's reports from the company that manufactures and installs the devices." *Id*. The officer "was not trained in the maintenance of or scientific principles behind the device." *Id*. "[S]he was familiar with the

---

[7] Ellis notes that the GPS records indicate he was at the house at dates and times not corroborated by Mother. The evidence at trial was that Mother worked and Victim was frequently at home alone. Moreover, the evidence was that Mother was not always aware of when Ellis was at the house.

9

electronic monitoring system and the reports that it generates." *Id*. The electronic monitoring system at issue was an ankle bracelet. *Id*. The officer testified that the records indicated the defendant was not present at home at a certain date and time. *Id*. The officer "acknowledged she did not know if there were other malfunctions of the machine or the phone lines that could possibly cause the readings at issue." *Id*. She also stated that "some telephone companies have more problems with the electronic monitoring devices than others." *Id*.

The defendant argued the court abused its discretion in permitting the officer to testify about how the monitoring system operated and why it would malfunction. *Id*. at 265-66. He claimed the testimony was mere speculation lacking foundation, outside the officer's expertise for reading reports generated by the system for which she was qualified to testify. *Id*. at 266.

The court noted that "[a]n expert is qualified if he or she has knowledge from education or experience which will aid the trier of fact" and that "[t]he extent of an expert's experience or training in a particular field goes to the weight, not the admissibility, of the testimony." *Id*. (internal quotation marks omitted). The court found that the officer possessed "some qualifications to testify about the electronic monitoring system and the reports it generated." *Id*. She had years of experience, received training in reading the reports, and was familiar with the contents of the reports. *Id*. The officer's "limited knowledge as to the scientific principles underlying the device went to the weight of her testimony, not to its admissibility." *Id*. The officer's "training and experience qualified her to speak about the basic components and functioning of the device and her interpretation of the reports generated by such." *Id*. The defendant was able to cross-examine the officer "about the limits of her knowledge and expertise with regard to the device." *Id*. The court concluded that "[t]he State laid an adequate foundation for the admission of [the officer's]

10

testimony regarding the operation of the ankle monitoring system and the reports it generates and the trial court did not abuse its discretion in admitting such evidence at trial." *Id*.

We find *Williams* instructive in the current case. Maguire was not an expert regarding how the BI Total Access System worked from a mechanical or scientific perspective. She was, however, an expert with respect to the requirements of lifetime supervision of offenders and how the office of probation and parole uses and interprets the BI monitoring system to track the location of offenders. Further, as in *Williams*, the defense was able to cross-examine Maguire regarding her lack of knowledge regarding the monitoring program. *See also State v. Brown*, 818 S.E.2d 735, 740–42 (S.C. 2018) ("We do not doubt that Agent Powell was a proper witness and likely able to lay the necessary foundation. But in terms of establishing the accuracy of the GPS records, Agent Powell simply observed the GPS records are accurate because '[w]e use it in court all the time'" …. "Other jurisdictions have allowed GPS records to be authenticated by someone who has general knowledge and experience with the system used, explains how the records are generated, and confirms the accuracy of the result.").

Ellis relies on cases like *State v. Patton*, 419 S.W.3d 125, 132 (Mo. App. E.D. 2013) where the court held that expert witness testimony was needed regarding using the locations of cell tower sites used by a cell phone to pinpoint location because "[t]o narrow down the area in which [a] phone must have been to have connected to a particular cell site—i.e., to proffer testimony actually probative of whether [defendant] was in one area rather than the other—required analysis of the many variables that influence cell site signal strength" and "such analysis amounts to opinion testimony that is properly the province of an expert." *Patton* is distinguishable because in the current case Maguire was not analyzing multiple variables to reach a conclusion about Ellis' location. Instead, she was using a tracking program that determined his location at set dates and

times. Further, here, the evidence was merely duplicative of the other evidence in the case as to Ellis' whereabouts during the timeframe Victim identified Ellis to be present at her home in January before school started. *See State v. Neighbors*, 502 S.W.3d 745, 750 n.4 (Mo. App. W.D. 2016).

The trial court did not abuse its discretion in admitting Maguire's testimony and the documents she produced. The point is denied.

**Point II**

In his second point on appeal, Ellis claims the trial court abused its discretion in admitting the testimony of Deborah Maguire and Exhibit 29 regarding Ellis' specific location at certain dates and times. He claims that section 559.125.2 creates a statutory privilege that prohibits the disclosure of "information or data obtained by a probation or parole officer" and such information or data "shall not be receivable in any court." Ellis argues that Maguire's testimony and Exhibit 29 violated this statute. He argues that there is a reasonable probability that the trial court's error affected the outcome of the trial because it corroborated Victim's testimony.

The probation system has two purposes: "rehabilitation of the probationer; and preventing probationer from committing the same crime in the future—thereby protecting public safety." *State v. Fetterhoff*, 739 S.W.2d 573, 576 (Mo. App. E.D. 1987). Section 559.125 provides in relevant part:

> 2. Information and data obtained by a probation or parole officer shall be privileged information and shall not be receivable in any court. Such information shall not be disclosed directly or indirectly to anyone other than the members of a parole board and the judge entitled to receive reports, except the court or the board may in its discretion permit the inspection of the report, or parts of such report, by the defendant, or offender or his or her attorney, or other person having a proper interest therein.

"The purpose of the statute is that the probationer know that information learned by the probation officer will be held in confidence." *Richardson v. Sherwood*, 337 S.W.3d 58, 65 (Mo. App. W.D.

12

2011). "The statute does not authorize discretion." *Id*.

Missouri courts have not addressed whether the admission of GPS evidence from an offender who is on lifetime supervision violates section 559.125.2. In *Williams*, 427 S.W.3d at 266, the defendant argued that the trial court plainly erred in allowing a probation officer to testify regarding "the results of the ankle monitoring system, because Section 559.125.2 RSMo 2012 creates a statutory privilege that prevents the disclosure of information or data obtained by parole or probation officers in that such information is privileged and is not receivable by any court." The appellate court, however, did not address the issue because it found that the defendant had "waived any privilege that may have existed by invoking the restrictions of his supervised probation and his claimed compliance with those restrictions to bolster his alibi defense." *Id*. at 267.

In the current case, we need not determine whether the admission of the GPS evidence violated section 559.125 because Ellis cannot show prejudice from that admission. *See id*. at 266 (We review admission of evidence for prejudice which means whether there is a reasonable probability that the trial court's error affected the outcome of the trial.). The GPS tracking was used to corroborate victim's testimony that one of the sexual encounters occurred in January before school started. This was charged as Count I. Ellis argues this corroboration of Count I also serves to corroborate Counts II and III because it indicated Victim was truthful in her testimony.

The evidence at trial was that Ellis was a close family friend and was frequently over at Victim's house during some of the time period encompassed by the GPS tracking. This evidence was persuasive without the GPS tracking records. As shown in the facts section of this opinion, the evidence of Ellis' guilt was overwhelming at trial. The phone records show a large number of calls and messages exchanged between Victim and Ellis. The messages were sexually explicit and

referenced past sexual contact between Victim and Ellis. Girlfriend was concerned about Ellis' relationship with Victim and reached out to others to express her concern. Mother, Girlfriend, and Stepfather all went to the police with concerns and cooperated with the police. Victim's delayed disclosure was explained by an expert witness. Further, evidence establishing that Ellis had previously engaged in similar acts of sexual intercourse with a minor female victim is evidence the jury was permitted to consider to establish Ellis' propensity to commit such offenses. Mo. Const. art. I, section 18(c) ("[I[n prosecutions for crimes of a sexual nature involving a victim under eighteen years of age, relevant evidence of prior criminal acts … is admissible for the purpose of corroborating the victim's testimony or demonstrating the defendant's propensity to commit the crime with which he or she is presently charged."). Even if the admission of the GPS records and Maguire's testimony was error, it was not prejudicial. The point is denied.

**Point III**

In his third point on appeal, Ellis claims the trial court abused its discretion in admitting T-mobile calls records and a records custodian's form letter, Exhibits 18 and 61, and Mother's testimony as to the content of the calls records. He states that no affidavit from a records custodian was admitted and the State did not call a witness to testify regarding the reliability and accuracy of the process by which the records were generated. Ellis argues that there is a reasonable probability that the trial court's error affected the outcome of the trial because the State used them to prove that there were a high number of texts and calls between Ellis and Victim and to corroborate Victim and Mother's testimony.

Mother testified that she received and paid Victim's T-Mobile bills, Mother's name was on the statement and service plan, and Mother had access to the account. State's Exhibit 18 were the call records for Victim's cell phone. Mother's name was on the record, and the records covered

14

the period of time from January 1, 2016, to the end of March 2016. Mother testified the records were a fair and accurate record of the phone records for Victim's phone during that period of time.

When the State moved for the admission of Exhibit 18, defense counsel objected on several grounds, including that State's Exhibit 18 was a business record, Mother was not the records custodian and could not provide a foundation for the admission of the records, and no affidavit of the records custodian was attached to the records. A form letter (Exhibit 61) was attached to the records from the T-Mobile records custodian, but no affidavit or sworn statement was attached to the records.

The prosecutor argued that Exhibit 61 was signed by the custodian of records and that he had certified that they were true and accurate records of the T-Mobile account. The records custodian also acknowledged that he understood "that if any of the statements made by [him] [t]herein [were] willfully false, [he] [was] subject to punishment." Additionally, the custodian of records stated in the exhibit that the "records were made at or near the time of the occurrence of the matters set forth by (or from information transmitted by) a person with knowledge of those matters" and that the "records were kept in the course of regularly conducted business activity" "as a regular practice." The prosecutor argued that the affidavit substantially complied with the requirements of section 490.692.

In addition, the State provided an affidavit (Exhibit 62) that morning to defense counsel and the trial court. However there were no documents attached to the affidavit provided that morning. The prosecutor argued that the affidavit was "exactly the same in form as the affidavit that [the defense] [was] put on notice of at the time of discovery."

The trial court admitted State's Exhibit 18. The trial court stated that Mother provided the necessary foundation, and, in addition, the trial court considered the form letter attached to the

15

records "to be an affidavit that substantially complies with the statute" The court found that the letter (Exhibit 61) and the affidavit (Exhibit 62) "appear . . . to be identical except that there's a cursive signature as opposed to an electronic signature . . . [a]nd then there's a notary signature on it, as well as a stamp . . . ."

Section 490.680 states:

A record of an act, condition or event, shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business, at or near the time of the act, condition or event, and if, in the opinion of the court, the sources of information, method and time of preparation were such as to justify its admission.

"Section 490.680 … sets forth the foundational requirements for a document to be admitted under the business record exception to the hearsay rule." *C & W Asset Acq., LLC v. Somogyi*, 136 S.W.3d 134, 138 (Mo. App. S.D. 2004). "When the enumerated statutory requirements are met, the statute invests the record with a presumptive verity, and so excepts them from the hearsay rule." *Id*. (internal quotation marks omitted). "The trial court has broad discretion in determining whether a party properly complied with this provision." *Id*. "Thus, the bottom line regarding the admissibility of the business records is the discretionary determination by the trial court of their trustworthiness." *Id*. (internal quotation marks omitted).

Instead of relying of the testimony of the custodian of records or other witness, an affidavit may be submitted. Section 490.692 states:

1. Any records or copies of records reproduced in the ordinary course of business by any photographic, photostatic, microfilm, microcard, miniature photographic, optical disk imaging, or other process which accurately reproduces or forms a durable medium for so reproducing the original that would be admissible under sections 490.660 to 490.690 shall be admissible as a business record, subject to other substantive or procedural objections, in any court in this state upon the affidavit of the person who would otherwise provide the prerequisites of sections

16

490.660 to 490.690, that the records attached to the affidavit were kept as required by section 490.680.

2. No party shall be permitted to offer such business records into evidence pursuant to this section unless all other parties to the action have been served with copies of such records and such affidavit at least seven days prior to the day upon which trial of the cause commences.

3. The affidavit permitted by this section may be in form and content substantially as follows:

THE STATE OF _____
COUNTY OF _____

### AFFIDAVIT

Before me, the undersigned authority, personally appeared .........., who, being by me duly sworn, deposed as follows:

My name is .........., I am of sound mind, capable of making this affidavit, and personally acquainted with the facts herein stated:

I am the custodian of the records of ........... Attached hereto are .......... pages of records from ........... These .......... pages of records are kept by .......... in the regular course of business, and it was the regular course of business of .......... for an employee or representative of .......... with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time of the act, event, condition, opinion or diagnosis. The records attached hereto are the original or exact duplicates of the original.

_____
Affiant

In witness whereof I have hereunto subscribed my name and affixed my official seal this .......... day of .........., 20 ....

_____
(Signed)                                                              (Seal)

"This Section provides a practical way to avoid the necessity of a personal appearance by a records custodian." *C & W Asset Acq., LLC*, 136 S.W.3d at 138 (internal quotation marks omitted). "Upon

17

compliance with §§ 490.680 and 490.692, business records may be admitted into evidence without any additional direct testimony." *Id*. (internal quotation marks omitted). The court's decision whether to admit the business records remains a discretionary determination of the trustworthiness of the records" *Id*. (internal quotation marks omitted). "The ultimate determination is whether in the opinion of the trial court the sources of the documents justify [their] admission." *Id*. at 139. "The Missouri Business Records as Evidence Law is designed to facilitate the admission of documents which experience has demonstrated to be trustworthy." *Id*. at 140 (internal quotation marks omitted). "The focus is on the character of the records with consideration for certain earmarks of reliability." *Id*. (internal quotation marks omitted).

In *State v. Simmons*, 270 S.W.3d 523, 530 (Mo. App. W.D. 2008), the defendant objected that business records were accompanied by copies of the business record affidavits instead of original affidavits. "The prosecuting attorney informed the court that the original affidavits had been filed with the court without any records attached and that copies of the affidavits were now attached to the exhibits." *Id*. "Although the prosecutor did not provide a satisfactory explanation as to why this had occurred, he assured the court that the original affidavits were at one time attached to the records the State sought to introduce and that the copies were exact duplicates of the original affidavits." *Id*. "Additionally, the original affidavits were in the trial court's file, and the court had an opportunity to compare the originals with the copies." *Id*. at 530-31. "The court determined that the copies appeared to match the originals and ruled that the exhibits were admissible." *Id*. at 531. This court concluded, "[a]lthough we do not condone the prosecutor's method of filing the original affidavits separately from the records and then attaching copies of the affidavits to the exhibits, we are unable to find that the trial court's ruling was against the logic of the circumstances or indicated a lack of careful consideration." *Id*. "The record shows that the

18

trial court heard extensive arguments on this issue both during trial and before it ruled on [defendant's] motion for a new trial." *Id*. "The court indicated that it was concerned about the manner in which the prosecutor handled the exhibits, but ultimately found the copies of the affidavits and the records to which they were attached to be reliable." *Id*. "Under this combination of circumstances, we cannot say that the trial court abused its discretion in admitting the exhibits." *Id*.

This current case involves a situation where the State provided a business record affidavit in compliance with the seven day deadline in section 490.692.2 but the affidavit was not notarized. The State provided a notarized affidavit on the day of trial, but that was outside the timeline required in section 409.692.2. *See State v. Mack*, 903 S.W.2d 623, 631 (Mo. App. W.D. 1995) (the seven day requirement in section 490.692.2 is more than a notice requirement, it helps alert the defense of the potential testimony of the records custodian, and it is plainly required by the statute).

The initial affidavit (Exhibit 61) proffered by the State was not notarized, but it did contain a declaration by the custodian of records for T-Mobile that the records for the particularly identified number were "true and complete copies of records maintained by T-Mobile," that they were "made at or near the time of the occurrence of the matters set forth by (or from information transmitted by) a person with knowledge of those matters," and that they were "kept in the course of regularly conducted business activity" "as a regular practice." The records custodian also declared, "I hereby certify that the foregoing statement made by me is true. I understand that if any of the statements made by me herein are willfully false, I am subject to punishment." *See* section 575.060 ("A person commits the offense of making a false declaration if … such person . . . [s]ubmits any written false statement, which he or she does not believe to be true . . . [o]n a form bearing notice … that false statements made therein are punishable . . . ."); section 492.060 ("In all cases in which

19

an oath or affirmation is required or authorized by law, every person swearing, affirming or declaring, in whatever form, shall be deemed to have been lawfully sworn . . . .").

The records custodian certified that the records were reliable and accurate. The records custodian later swore this in a notarized affidavit. Defense counsel received the records and Exhibit 61 more than seven days before trial. This was sufficient notice for the defense to subpoena the records custodian to appear at trial to be cross examined if Ellis wanted to challenge the reliability of the phone records. Defense counsel did not request a continuance to allow the records custodian to be subpoenaed to address any prejudice he believed was caused. Mother testified that she had access to the phone records as the account holder and that the records being admitted were a fair and accurate record of the phone records for Victim's phone during the relevant period of time. The court found that all of this supported a finding that the phone records were accurate and reliable and should be admitted. We do not find the trial court abused its discretion in making that finding. The point is denied.

**Point IV**

In his fourth point on appeal, Ellis claims the trial court abused its discretion and plainly erred in admitting the screenshots and photographs of the texts on Victim's tablet, Exhibits 2 and 17. He states that the completeness and author of the texts were in dispute, the tablet was the best evidence of the complete conversation, and the tablet was no longer operational due to the State's negligence in storing the tablet. Ellis argues that there is a reasonable probability that the trial court's error affected the outcome of the trial and that manifest injustice occurred because the State used Exhibits 2 and 17 to corroborate Victim's testimony and as independent proof of guilt.

Ellis objected to Exhibit 2 on the basis that the actual tablet was the best evidence. He did not object to Exhibit 17 on that basis, however. Instead, he objected to Exhibit 17 on the basis of

20

hearsay. He later objected "based on the reasons that I have made objections to." "To preserve an objection to evidence for review, the objection must be specific, and the point raised on appeal must be based upon the same theory." *State v. McKibben*, 998 S.W.2d 55, 59 (Mo. App. W.D. 1999) (internal quotation marks omitted). Accordingly, Ellis requests plain error review with respect to the trial court's admission of Exhibit 17.

The tablet was stored in the Kansas City Police Department's property and evidence warehouse. On August 23, 2018, there was a fire at the warehouse while the tablet was present. The fire was not an intentional act. The tablet was damaged when the sprinkler system went off, and the tablet would no longer turn on.

Mother testified that she took pictures of the tablet while she was sitting at the police station. They were introduced as Exhibit 17. Mother's pictures did not encompass all of the messages on the tablet.

Sergeant Cranston took possession of the tablet from Mother. He testified that he was trained as to two primary ways to collect evidence from devices like cell phones or tablets: 1) connecting the device to a computer system that obtains a "dump" of all of the content on the device; or 2) manually examining the contents. Because he did not have the capability of connecting the device to a computer system at the time he first received the tablet, Sergeant Cranston used the tablet to take screenshots of the messages and then saved them to a case file on the police network drive. He tried to capture the complete conversation. The screenshots were admitted as Exhibit 2. One of the text messages in the pictures Mother took did not appear in the screenshots Sergeant Cranston took. He was cross examined about the discrepancy and admitted he must have missed that message.

Victim testified that the messages in Exhibit 2 were a fair and accurate reflection of the messages she exchanged on the tablet. Victim believed she was exchanging messages with Ellis.

Detective Stickler testified that he took the tablet to the Regional Computer Forensics Laboratory ("RCFL") on February 7, 2018, to see if anything else could be extracted from the tablet. No new information was obtained from the extraction. Detective Stickler also testified that the tablet had been secured in the police property room for approximately seven months before the fire and that defense counsel would have been permitted to examine the tablet during that time.

The Deputy Director of the RCFL confirmed that the extractions were performed correctly without any errors, though the final step of the file system extraction had been missed. That omission would not have affected either the quality or amount of data recovered, however.

"The 'best evidence' rule is that generally the terms of a document must be proved by production of the original document." *Boroughf v. Bank of Am., N.A.*, 159 S.W.3d 498, 503 (Mo. App. S.D. 2005) (internal quotation marks omitted). "The best evidence rule applies only when the evidence is offered to prove the terms or contents of a writing or recording." *Id*. (internal quotation marks omitted). "In other words, the principle is limited to proof of the operative terms of substantive written documents." *Id*. (internal quotation marks omitted). "Generally, this involves a witness purporting to testify as to his or her observation of the operative terms of a substantive written document." *Id*. (internal quotation marks omitted). "The principal reason for the rule is the danger of mistransmission of the contents of a writing when evidence other than the writing itself is offered for the purpose of proving its terms." *Id*. (internal quotation marks omitted). "A copy reproduced by a photographic duplicating process is not admissible under the best evidence rule." *Id*. (internal quotation marks omitted). "The trial court of course, is allowed

broad discretion in determining whether the best evidence rule should be applied." *Id*. (internal quotation marks omitted).

"[T]he best evidence rule does not preclude the introduction of secondary evidence." *Id*. (internal quotation marks omitted). "Secondary evidence may ... be admitted if the offering party demonstrates that the primary evidence is lost or destroyed, is outside the jurisdiction, is in the possession or control of an adversary, or is otherwise unavailable or inaccessible." *Id*. (internal quotation marks omitted). "The trial court is vested with wide discretion in determining the sufficiency of a foundation for the introduction of secondary evidence." *Id*. (internal quotation marks omitted). "When dealing with copies of original documents, the correctness of a copy may be proved by the testimony of a person who has compared the copy with the original and found it to be correct." *Id*. at 504.

"In particular, a photocopy as secondary evidence is admissible if there is a foundation showing that: '(1) the original is unavailable, (2) the unavailability is not the proponent's fault, and (3) the secondary evidence is trustworthy." *Id*. at 503 (internal quotation marks omitted). It is undisputed that the tablet is unavailable. "The state satisfies the second requirement if it can prove that it has not acted in bad faith to prevent the introduction of the original." *State v. Rhodes*, 869 S.W.2d 797, 799 (Mo. App. W.D. 1994) (internal quotation marks omitted). While Ellis characterizes the fire as being the result of the State's negligence, it is undisputed that the fire and resulting water damage from the sprinkler were not the result of bad faith action on the part of the State.

The last prong is whether Exhibits 2 and 17 are trustworthy. Ellis argues that Exhibits 2 and 17 are not trustworthy because they were not complete depictions of the messages on the tablet. As discussed above, the primary purpose of the best evidence rule is to prevent

23

mistransmission of the contents of a writing. *Boroughf*, 159 S.W.3d at 503. Ellis does not argue that the contents of Exhibits 2 and 17 do not accurately reflect the wording of the messages they portray. Instead, his argument is focused on missing messages. The messages in this case were discrete, separate messages. They were not one long message or one long communication. That there are messages not documented does not render the ones that were documented untrustworthy.[8]

Ellis also argues that a full depiction of the messages on the tablet could have demonstrated that someone other than Ellis sent the texts. Victim testified that Ellis called her by a nickname in the photographed messages that he always used for her. The photographed messages contained the messages Girlfriend sent to Victim when she discovered the messages between Victim and Ellis. The messages indicated that calls were made in the application at the times Victim testified she and Ellis called each other. One of the messages in the exhibit referred to using the Xbox as a means of communication, which was consistent with Victim's testimony that she had previously used the Xbox to communicate with Ellis. One of the messages asked if Victim missed "my tongue ring" which was consistent with the fact that Ellis had a tongue ring.

Victim testified that Ellis referred to himself as "Daddy" in the messages, and she used the name for him in the messages because he liked it. Victim testified that she referred to Stepfather as her "stepdad" and never as "daddy." Mother and Stepfather confirmed that with their testimony. While Ellis argued that Stepfather sent the messages, Victim testified that Stepfather was never sexually inappropriate to her.

The messages in Exhibits 2 and 17 are not barred by the best evidence rule. Moreover, a foundation existed that the messages accurately reflected the messages they depicted. Ellis'

---

[8] We note that the evidence at trial was that Victim deleted messaged between herself and Ellis many times and the content of those messages was never discovered.

argument that he was unfairly prevented from proving that he was not the sender of the messages is without merit. The trial court did not abuse its discretion in admitting Exhibits 2 and 17. The point is denied.

## Conclusion

The judgment is affirmed.

_____

Anthony Rex Gabbert, Judge

All concur.