

# In the Missouri Court of Appeals
# Eastern District

<u>DIVISION FIVE</u>

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED99841 |
| | ) | |
| Plaintiff/Respondent, | ) | Appeal from the Circuit Court |
| | ) | of the City of St. Louis |
| v. | ) | |
| | ) | |
| BELVIN L. WILLIAMS, JR., | ) | Honorable Steven R. Ohmer |
| | ) | |
| Defendant/Appellant. | ) | Filed: April 1, 2014 |

<u>Introduction</u>

Belvin L. Williams, Jr. (Appellant) appeals from the trial court's judgment convicting him of first-degree assault, first-degree robbery and two counts of armed criminal action. We affirm.

<u>Factual and Procedural Background</u>

The State charged Appellant with one count of first-degree assault, one count of first-degree robbery and two counts of armed criminal action. The evidence presented at trial is as follows.

Around 3:00 p.m. on January 29, 2011, Appellant celebrated his birthday by having dinner with Denise Crenshaw (Crenshaw) and two of his children at the Lumiere buffet. Appellant and Crenshaw have a son together but are no longer a couple. After dinner, Crenshaw dropped the children off at Appellant's mother's house and went home.

Around 10:00 p.m., Crenshaw went out with a group of people including her friend Jennifer[1] and Jennifer's cousin, Lamont Grady (Grady). Grady parked his car across the street from Crenshaw's house before leaving in Jennifer's car with Jennifer and Crenshaw. After having a few drinks at a bar, they drove to a club in East St. Louis. Grady and Jennifer left Crenshaw and went to another club to get something to eat. Afterward, Jennifer drove Grady back to St. Louis to get his car.

Jennifer dropped Grady off at his car between 4:00 and 5:00 a.m. Grady's car windows were fogged up, so he sat in his car, letting them defrost. Suddenly, Grady heard a loud bang on the car window. Grady could not see through the frost and his electric window did not work so he opened the car door. A man, later identified as Appellant, put a gun in Grady's face and said something to the effect of "What the f--- are you doing?" Appellant said, "I told you to stop 'effing' with my girl," and shot Grady in the thigh while he was sitting in the car. Appellant ordered Grady out of the car and onto the ground. As he lay on the ground, Appellant hit Grady in the head with the gun, took his wallet and shot him three more times. Grady testified he heard the gun click, as if the gun either misfired or ran out of ammunition.

Grady heard someone yell, "Come on, man, like he's not worth it." Appellant told Grady not to move and then quickly walked off. Grady then heard tires squealing and exhaust pipes. Grady went back to his car, called 911 and drove off. When he passed the police cars responding to the call, he followed them back to the scene.

Grady testified he did not know Appellant and had never seen him before that night. Later, when discussing the incident with his cousin Jennifer, she told him that Appellant must have been the shooter. Jennifer showed him a photo of Appellant and

---

[1] No disrespect is intended by use of Jennifer's first name but the record does not disclose her last name.

Grady recognized him as the shooter. Grady relayed this information to police. Grady subsequently identified Appellant as the shooter in a physical lineup.

Appellant testified he finished having dinner with Crenshaw and his children at approximately 6:00 p.m. Appellant then picked up his girlfriend, Lareisha Bostic (Bostic), stopped by his work and returned home. Appellant testified "it was time for me to be in the house at that time. At 7 o'clock it's time to go home." Appellant testified that a few friends came by his house and that he drank and played cards until 1:00 or 1:30 a.m., before going to bed. Appellant stated he was at home asleep until Bostic woke him around 9:00 or 10:00 a.m. on January 30. Appellant asserted he did not leave the house again until Monday morning, January 31, 2011, when he went to work. Appellant denied being outside Crenshaw's home at 5:00 a.m. on January 30, 2011, stating he was at home at that time.

Appellant testified as follows during direct examination:

> Q. Now, [Appellant], you have a criminal record, do you not, sir?
> A. Yes, sir.
> Q. And at the time you were on parole; is that correct?
> A. Yes.
> Q. You have been convicted of a felony?
> A. Yes.
> Q. And you were under supervision of a parole officer, correct?
> A. Yes, sir.
> Q. And that was one of the reasons you had to be in by a certain time; is that correct?
> A. Yes.
> Q. And during -- on January 29th and 30th, did you comply with your parole officer's directives to be in by a certain time?
> A. Yes, sir.

Bostic testified on Appellant's behalf. In January 2011, she and Appellant were living together and she was pregnant with Appellant's child. Bostic testified she knew Appellant was home by 7:00 or 8:00 p.m. on January 29 because "those were the rules for

3

him to be in the house." Bostic stated Appellant's friends came over to play cards that evening and Appellant went to bed around 1:30 a.m. Bostic stated Appellant was asleep in bed when she woke up with morning sickness around 3:00 or 3:30 a.m. and again at 7:00 a.m.

Bostic testified she asked the property management company to fix the phone on January 17, 2011. Bostic stated by January 24, 2011, the phone was not fixed so she made another complaint but they did not fix it. Bostic testified the telephone lines were coming out of the "box" inside the house and were exposed on the outside of the house.

The defense also called Kari Welker (Welker), the acting community manager for the property management company who testified the company's records indicated a complaint was made about the phone system at Bostic's residence on January 17, 2011 and the repairs were completed on January 24, 2011. Welker testified there is no record of any complaint being made about Bostic's phone system after that date.

Over the State's objection, the defense also called Oleatha Warren (Warren), an employee of YourTel America, a company that provides home and cellular phone services. Warren testified the repair records for Bostic's residence indicate that on January 17, 2011, a complaint was made that the customer's phone had no dial tone. The records indicate a repairman went to the property and the problem was resolved. Warren stated another complaint of no dial tone was made on January 22, 2011. Warren's records indicated that the repair was "completed to satisfaction," meaning it was "back up and running." Warren stated the records indicated no other repair requests were made between December 2010 and February 2011.

4

In rebuttal, the State called Marcia Townsend (Townsend), Appellant's parole officer. Townsend testified that beginning on January 19, 2011, Appellant was on an electronic monitoring program which monitored when he entered and exited his residence. Appellant had a mandatory curfew but was allowed to leave to go to work.

Townsend testified the electronic monitoring system reported that Appellant made an "unauthorized leave," meaning he left his residence outside of his scheduled curfew, at 12:53 a.m. on January 30, 2011. The system then showed an "unauthorized entry" at 5:36 a.m. Townsend testified the records indicate Appellant was not present at home between those times. Townsend testified she called Appellant after receiving a notification that Appellant's location needed to be verified, but no one answered the house phone and Appellant's cell phone was disconnected.

In sur-rebuttal, the defense recalled Bostic who testified that on one occasion between one and two weeks prior to the incident, Townsend called their home phone and stated the electronic monitoring system was showing Appellant had committed an unauthorized leave from the house and asked Bostic where Appellant was. Bostic testified Appellant was standing next to her at the time, that she advised Townsend of such, and that Appellant put Townsend on speaker phone to prove that he was at home. Bostic testified this incident occurred during a time when Bostic was not getting a dial tone on her home phone and this precipitated her complaint about her phone service. Bostic testified she did not receive a phone call on January 30.

The jury found Appellant guilty on all counts. On April 5, 2013, the court sentenced Appellant to four consecutive twenty-year terms of imprisonment. This appeal follows.

5

In his first point on appeal, Appellant argues the trial court abused its discretion by denying his request to replace a juror, Juror Hilt, with the alternate juror because the trial court's refusal to do so denied Appellant his right to due process and a fair trial by a fair and impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Article I, Sections 10 and 18(a) of the Missouri Constitution, in that the trial court was aware Juror Hilt was seen sleeping during trial, Juror Hilt admitted to nodding off and being very close to dozing off, and Juror Hilt offered out of fairness to be replaced.

On the second day of trial, after all the evidence was adduced and the instructions were read by the court to the jury, defense counsel requested a side bar. At that time, defense counsel stated that Juror Hilt was "substantially nodding off," counting at least ten occasions when he had "closed his eyes and his head went down and then he stumbled" during testimony. Counsel expressed concern that this "may be a problem when they deliberate." At that time, the prosecutor stated he had not observed anything. Defense counsel did not make a motion to strike the juror at this point and the proceedings continued.

After closing arguments, defense counsel again raised the issue with the court, stating he saw Juror Hilt sleeping during closing arguments and the juror next to him prod him awake with his elbow. After excusing the rest of the jury for their lunch recess, the court conducted the following examination of Juror Hilt.

THE COURT: I just want to be sure. I noticed a few times that you might have been sort of nodding.

6

JUROR HILT: But I didn't doze off.

THE COURT: Were you following?

JUROR HILT: Yes. I was close to it, but I did not doze off.

THE COURT: Okay. I mean, you know, I know sometimes, you know, that's -- people, you know, do that, but it doesn't mean that they are sleeping. I mean, I just – you're okay and everything?

JUROR HILT: Yes.

THE COURT: You're not on any medication or anything like that --

JUROR HILT: No.

THE COURT: -- that would affect that?

JUROR HILT: Now it is just I haven't slept well the last couple of nights. In fact, the person next to me -- I said, now, if you see me start to doze off or you think I'm dozing, nudge me.

THE COURT: Okay.

JUROR HILT: And he nudged me once or twice and it was right at that point, but no.

THE COURT: You followed everything throughout the case?

JUROR HILT: Yes, sir.

THE COURT: Monday or yesterday and today?

JUROR HILT: If I hadn't I would tell you, sir.

THE COURT: Okay. You're comfortable then proceeding?

JUROR HILT: Yes.

THE COURT: You don't feel you missed anything?

JUROR HILT: No.

THE COURT: Seemed like you -- I watched you and, you know, like your head would kind of fall, but it would come up. It didn't seem like – it didn't stay for any length and that you were catching yourself, but you were following everything?

JUROR HILT: That one time you all were talking over there, I thought you were talking about me.

THE COURT: I just want to be sure that you know.

JUROR HILT: Yeah.

THE COURT: Because sometimes --

JUROR HILT: I understand that it is very important.

THE COURT: It could be medication. It could be a lot of reasons. And that's what it is. So no problem with that. I just want to make sure.

JUROR HILT: Okay.

THE COURT: Because in fairness to you --

JUROR HILT: I understand.

THE COURT: -- to make this decision, you know, I want to be sure that you got everything and that you're comfortable proceeding, so you're okay?

JUROR HILT: Yep.

THE COURT: Okay. Very good…

7

Defense counsel also took the opportunity to question the juror. Following the examination of Juror Hilt, the court denied Appellant's motion to replace the juror, stating:

> ... I did notice him yesterday, but it was the same as today because I observed him after you brought it to this Court's attention and it was a matter of closing his eyes and his chin going down and then he was popping up. He admitted that the man next to him did give him an elbow. He also said he's not missed anything. He's comfortable. He has followed this[.]
>
> … I've noticed him. It was no more than an instant. I mean, you say seconds. I don't know. Second or two. It certainly wasn't of any length and then -- and then he -- he was up. His eyes were open. He didn't have a grogginess or, you know, his head swaying from side to side. And I made sure that I watched him. I've talked to him. He has no concerns. He's indicated that he's followed everything. He understands the importance. And I don't see any reason to dismiss him. So motion again is denied.

Appellant included the issue in his motion for new trial, which the trial court denied, finding:

> … I questioned him to a great extent and I feel that he responded and -- and I still based upon everything that was presented see no reasoning to remove the juror. I don't think that removing jurors should be done lightly, and there's no indication that anything was missed.

The substitution of a juror during trial is a matter entrusted to the trial court's discretion. State v. Rose, 169 S.W.3d 132, 134 (Mo. App. E.D. 2005). On appeal, this Court will not disturb a trial court's ruling regarding the substitution of an alternate juror for a regular juror during trial absent an abuse of that discretion. Id. "The trial court is in the best position to determine a juror's ability to effectively discharge his or her duties." Id.

The trial court did not abuse its discretion in denying Appellant's motion to replace Juror Hilt. The court personally observed the juror's behavior, noting the juror

8

would momentarily close his eyes and nod his head but that he would almost immediately recover and appeared to be attentive. During a lengthy examination of the juror by the court and defense counsel, the juror acknowledged his conduct and repeatedly asserted that he had not fallen asleep and had not missed the presentation of any evidence. The court did not believe it was necessary to replace Juror Hilt and the trial court is in a far better position than this Court to gauge the attentiveness of the juror. Appellant's Point I is denied.

### Points II and III

In his second and third points on appeal, Appellant challenges the court's admission of Townsend's testimony regarding the electronic monitoring system.

At trial, Townsend testified she had 14 years' experience as a probation and parole officer for the State of Missouri. She testified she received two days of training on interpreting the electronic monitoring system's reports from the company that manufactures and installs the devices. Townsend acknowledged she was not trained in the maintenance of or scientific principles behind the device. Townsend did, however, testify that she was familiar with the electronic monitoring system and the reports that it generates.

Townsend testified the electronic monitoring system uses an ankle bracelet placed on the client, a receiver that communicates through the telephone line and a power cord. The monitoring system has a backup battery and system so clients cannot manipulate the equipment; however, the clients are not told of this fact. The system will continue to gather information if unplugged or disconnected and will transmit the accumulated collected data when the receiver is reconnected to the telephone jack.

9

Townsend testified that at 12:33 a.m. on January 30, 2011, Appellant's monitor reported a power loss and a power restore, meaning the device was momentarily unplugged from the power source. Then at 12:53 a.m., Townsend received from Appellant's monitor a "need location verify" message, meaning the receiver could not communicate with the telephone line or that the phone jack was disconnected from the telephone service. At 3:10 a.m., the report indicated there was a "received missed call back," meaning the device was still looking to be plugged into the telephone jack.

At 10:23 a.m. on January 30, 2011, Appellant's monitoring device was reconnected and the information stored in the backup system started to download. At that time, the monitoring system reported that Appellant made an "unauthorized leave," meaning he left the residence outside of his scheduled curfew, at 12:53 a.m. on January 30, 2011. The system then showed an "unauthorized entry" at 5:36 a.m. Townsend testified no other issues were reported after that. Townsend testified the records indicate Appellant was not present at home between 12:53 a.m. and 5:36 a.m. on January 30, 2011. Townsend testified that unplugging the device from its power source or the phone line will not result in the system registering a false unauthorized leave or entry.

During cross-examination, Townsend acknowledged she did not know if there were other malfunctions of the machine or the phone lines that could possibly cause the readings at issue. Townsend stated some telephone companies have more problems with the electronic monitoring devices than others and that YourTel has more problems than AT&T. Townsend testified she called Appellant after receiving the "need location verify" notification and no one answered the house phone and Appellant's cell phone was

10

disconnected. Townsend stated if the phone line was not working, it would report "receiver callback" or "need location verify."

Appellant contends the court abused its discretion in permitting Townsend to testify as to her opinion on how the monitoring system operated and when and why it would malfunction because the testimony was mere speculation lacking foundation, outside of Townsend's expertise for "reading reports" generated by the system for which she was qualified to testify, and invaded the province of the fact finder on the ultimate issue of Appellant's guilt.

The trial court has broad discretion in deciding whether to admit or exclude evidence at trial. State v. Forrest, 183 S.W.3d 218, 223 (Mo. banc 2006). This Court will reverse the trial court's ruling on the admission of evidence only when the court has clearly abused its discretion. Id. The trial court abuses its discretion when the ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration. Id. In addition, we review "for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." Id. at 223-24. An error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial. Id. at 224.

The trial court also has discretion in determining whether a witness qualifies as an expert. State v. Seddens, 878 S.W.2d 89, 92 (Mo. App. E.D. 1994). An expert is qualified if he or she has knowledge from education or experience which will aid the trier of fact. Id. "The extent of an expert's experience or training in a particular field goes to the weight, not the admissibility, of the testimony." State v. Poole, 216 S.W.3d 271, 274-75 (Mo. App. S.D. 2007). The expert's testimony should be allowed if the witness

11

possesses "some qualification." Id. Whether the testimony carries any probative value is left to the finder of fact. Id.

Here, Townsend possessed some qualifications to testify about the electronic monitoring system and the reports it generated. Townsend had 14 years' experience as a probation and parole officer, received training in reading the reports generated by the system and was familiar with the contents of the reports in the normal course of her employment. Townsend's limited knowledge as to the scientific principles underlying the device went to the weight of her testimony, not to its admissibility. Townsend's training and experience qualified her to speak about the basic components and functioning of the device and her interpretation of the reports generated by such. Appellant was able to cross-examine Townsend about the limits of her knowledge and expertise with regard to the device. The State laid an adequate foundation for the admission of Townsend's testimony regarding the operation of the ankle monitoring system and the reports it generates and the trial court did not abuse its discretion in admitting such evidence at trial. Appellant's Point II is denied.

Next, Appellant asserts the trial court plainly erred in permitting Townsend to testify as to any information or data obtained by her concerning Appellant, including and not limited to the results of the ankle monitoring system, because Section 559.125.2 RSMo 2012 creates a statutory privilege that prevents the disclosure of information or data obtained by parole or probation officers in that such information is privileged and is not receivable by any court.

Appellant concedes that he did not preserve this claim of error for appellate review and requests this Court to engage in plain error review. Under plain error review,

the defendant must show that an evident, obvious, and clear error affected a substantial right resulting in manifest injustice or a miscarriage of justice. Rule 30.20[2]; State v. Gillespie, 401 S.W.3d 560, 562-63 (Mo. App. E.D. 2013). It is the defendant's burden to demonstrate plain error. Id.

Section 559.125 provides:

> 2. Information and data obtained by a probation or parole officer shall be privileged information and shall not be receivable in any court. Such information shall not be disclosed directly or indirectly to anyone other than the members of a parole board and the judge entitled to receive reports, except the court or the board may in its discretion permit the inspection of the report, or parts of such report, by the defendant, or offender or his attorney, or other person having a proper interest therein.

Appellant contends the trial court erred in allowing Townsend to testify that Appellant, one of her parolees, was on an electronic monitoring program and that the monitoring system showed Appellant made an unauthorized leave and reentry on the morning of the crime because, pursuant to the terms of Section 559.125.2, this information obtained by Townsend was privileged and was barred from being accepted as evidence in any court. We find, however, that Appellant has waived any privilege that may have existed by invoking the restrictions of his supervised probation and his claimed compliance with those restrictions to bolster his alibi defense.

Waiver can occur by several means. One method, known as "at issue" waiver, occurs "'when the privilege holder makes assertions in a litigation context that put its otherwise privileged communications in issue.'" State ex rel. St. John's Regl. Med. Ctr. v. Dally, 90 S.W.3d 209, 215 (Mo. App. S.D. 2002), quoting Resolution Trust v. Massachusetts Mut. Life Ins., 200 F.R.D. 183, 191 (W.D.N.Y. 2001).

---

[2] All rule references are to Mo. R. Crim. P. 2012.

A party may also waive a privilege when the privilege is invoked in some fundamentally unfair way. "The so-called 'fairness doctrine' is grounded in the notion that it is unfair to permit a party to make use of privileged information as a sword when it is advantageous for the privilege holder to do so, and then as a shield when the party opponent seeks to use privileged information that might be harmful to the privilege holder." Dally, 90 S.W.3d at 215-16. Accordingly, a privilege may be waived when a party asserts a claim that in fairness requires examination of protected communications. Id. "Missouri courts have historically invoked a 'fairness' rationale to preclude a privilege holder from using the privilege strategically to exclude unfavorable evidence while at the same time admitting favorable evidence." Id.

Both waiver doctrines apply in this case. At trial, Appellant testified he was home by 7:00 p.m. on January 29, 2011, and that he did not leave until the morning of January 31 when he left for work. Appellant testified he had to be at his house by a certain time because he was under the supervision of a parole officer. During direct examination, Appellant further testified that *he complied with his parole officer's directives* on January 29 and 30. Bostic, who testified on Appellant's behalf, also stated that she knew Appellant was home by 7:00 or 8:00 p.m. on January 29 because "those were the rules for him to be in the house."

It was Appellant who raised his parole status and used his alleged compliance with the restrictions of his parole to support his alibi defense. By asserting compliance with his parole officer's directives, Appellant waived any alleged statutory privilege he might have had in the data his parole officer received from the electronic monitoring system contradicting such assertion. By directly injecting the issue into the case,

14

Appellant waived any privilege and the State was free to admit evidence contradicting Appellant's testimony. See also State v. Gillespie, 401 S.W.3d 560, 563 (Mo. App. E.D. 2013) ("If the defendant raises an issue directly or by implication, the prosecutor can present otherwise inadmissible testimony to counteract the negative inference the defense has injected into the case."). Accordingly, Townsend's testimony was properly introduced to disprove or counteract Appellant's testimony that he complied with his parole restrictions.[3] Appellant's Point III is denied.

### Conclusion

The judgment of the trial court is affirmed.

_____
Sherri B. Sullivan, J.

Robert M. Clayton III, C.J., and
Angela T. Quigless, J., concur.

---

[3] This Court also notes that Appellant presented his evidence laying the groundwork for his defense to Townsend's testimony before Townsend was called to testify. It was Appellant who called Welker and Warren to testify about their records of complaints they received from Bostic about a faulty phone line, elicited testimony from Bostic about the physical condition and various problems with her home phone line, and who personally testified about the condition of his home phone line. All of this evidence had questionable relevance in the absence of the State's *rebuttal* evidence from Townsend that Appellant was subject to an electric monitoring system that utilized Appellant's home phone line.