

# In the Missouri Court of Appeals
## Eastern District
### DIVISION ONE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED112801 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of the |
| | ) | City of St. Louis |
| vs. | ) | 2122-CR00459-01 |
| | ) | |
| LEDRA CRAIG, | ) | Honorable Madeline O. Connolly |
| | ) | |
| Appellant. | ) | Filed: September 9, 2025 |

Before Robert M. Clayton III, P.J., Lisa P. Page, J., and Michael E. Gardner, J.

Ledra Craig (Appellant) appeals from the trial court's judgment entered on his convictions and sentences of murder in the first degree and armed criminal action, following a jury trial. We affirm.

## BACKGROUND

Appellant was charged with the class A felony of murder in the first degree and the unclassified felony of armed criminal action. He was tried by a jury in April 2024, during which the following evidence was adduced, viewed in the light most favorable to the verdict.[1]

At 5:52 p.m. on February 5, 2021, Victim returned home from work and parked at the end of his cul-de-sac in the Lindenwood Park neighborhood in the City of St. Louis. Neighbors testified that they heard a loud noise and looked outside to see a white sedan speeding away.

---

[1] When reviewing a criminal conviction, appellate courts view the facts and any inferences therefrom in the light most favorable to the jury's verdict. *State v. Storey*, 901 S.W.2d 886, 891 (Mo. banc 1995).

One neighbor, who was a nurse (Nurse), went outside and observed a white car backing out of the dead-end street. She found Victim shot and without a pulse. He was pronounced dead at the hospital.

The medical examiner testified the cause of death was homicide from a single gunshot wound to the head and neck. The officers found a shell casing near Victim, and received other eye-witness reports of a white car. Officers obtained video footage from Victim's wife and another neighbor, leading police to determine the suspect vehicle was a distinctive white Toyota Avalon sedan with a sunroof, possibly alloyed wheels, and a pointed vent window on the back end that stood out, driven by a black male wearing all black. Police obtained other videos from a Realtime Crime Center showing what appeared to be the same vehicle nearby at Arsenal and Jamison streets at 5:55:54 p.m. the same day as the shooting. Video footage also showed Appellant parking his white car outside of his residence at approximately 6:10 p.m., which is about how long it would have taken him to drive home from the scene of the murder.

On the morning of March 7, 2021, an off-duty police sergeant stopped at a gas station in the Lindenwood Park area and saw the suspect car wanted in his investigation of Victim's homicide. The sergeant followed the vehicle and saw a young black male driving, wearing all dark clothing, a hood, and a mask. He said "everything started to match up." He processed the license plate and it did not match the car. Once the sergeant determined probable cause to stop the vehicle he called the officer on duty to do so. Responding officers stopped and arrested Appellant, who told the officers he had no weapons. However, during a safety pat-down, the officers found a black handgun with white paint on the handle in Appellant's waistband. Officers seized and emptied the gun, which had been loaded with one round in the chamber and six shells in the magazine. Appellant admitted he was the only person who drove his car.

2

After Appellant was arrested, he consented to a search of his phone. Appellant's phone logged the date and time of his location in Lindenwood Park on February 5, 2021, between 5:30 and 5:34 p.m., just before the homicide took place at 5:52 p.m. A video was downloaded the day after the homicide with a news story and picture of Victim. Appellant also identified himself by Victim's first name, Donald, during text conversations on February 7 and 10, 2021, in which Appellant inquired about purchasing a Glock 19 firearm.

The jury found Appellant guilty of first-degree murder and armed criminal action. The trial court sentenced him to consecutive terms of life imprisonment without the possibility of probation or parole on the murder count and fifteen years on the armed criminal action. This appeal follows.

## DISCUSSION

Appellant raises two points on appeal. In his first point, he alleges the trial court clearly erred and abused its discretion when it overruled defense counsel's motions to remove Juror No. 204 and replace that juror with the alternate when, during the presentation of evidence, he informed the court that he recognized one of the state's witnesses and later saw Appellant in shackles being transported from the elevator to the courtroom. Appellant argues this violated his rights to a fair and impartial jury, due process of law, and a fair trial, under the U.S. Constitution, Amendment V, VI, and XIV, and the Missouri Constitution, Article I, Sections 10 and 18(a), in that these occurrences indicated bias and a suitable alternate juror was available.

In his second point, Appellant alleges the trial court plainly erred in not *sua sponte* ordering the jury to disregard the state's repeated rebuttal closing argument remarks that Appellant was a "serial killer" making his first "thrill kill," which violated his rights to be tried only on the charged offense, due process of law, and a fair trial, under the U.S. Constitution,

Amendments V, VI, and XIV, and the Missouri Constitution, Article I, Sections 10, 17, and 18(a). Appellant contends the prosecutor's argument was highly prejudicial and inflammatory, argued facts not in evidence, unfairly demeaned him, and encouraged the jury to convict Appellant out of fear of future dangerousness instead of a determination beyond a reasonable doubt that he was guilty of the charged offenses of murder in the first degree and armed criminal action.

## Point I

Appellant's first point alleges the trial court clearly erred and abused its discretion when it overruled defense counsel's motions to remove Juror No. 204 and replace that juror with the alternate. During the presentation of evidence, Juror No. 204 informed the court that he recognized one of the state's witnesses. Appellant also claims Juror No. 204 saw him in shackles being transported from the elevator to the courtroom. Appellant argues these occurrences created bias and a suitable alternate juror was available.

*Relevant Facts*

After trial commenced, the court notified the attorneys that Juror No. 204 had informed the bailiff that he recognized a testifying witness as his brother's nanny, but did not know her by name, and "it would not affect his ability to be fair." The court brought the juror in for questioning, outside of open court.

> [Court]: All right. The bailiff told me that you gave her some information. Can you just tell me now that we're on the record?
>
> [Juror No. 204]: One of the witnesses that had the video –
>
> [Court]: Yes.
>
> [State]: The first or the second lady?
>
> [Juror No. 204]: Rachel. She was a nanny for one of my brothers.

4

[State]: Did you know her well?

[Juror No. 204]: I knew her.

[Court]: How do you know her?

[Juror No. 204]: She was my brother's nanny.

[Court]: Okay, and did you ever have conversations with her?

[Juror No. 204]: Yes.

[Court]: Okay. Did you not recognize her name when it was read?

[Juror No. 204]: I did not.

[Court]: But you recognized her in person?

[Juror No. 204]: When I saw her.

[Court]: Okay. Do you have any concerns about being fair to both sides in this case based on that?

[Juror No. 204]: No, I just thought I'd bring it up if there was an issue for anybody.

[Court]: Okay. [Assistant Prosecutor], any questions you want to ask him?

[Asst. Prosecutor]: I think you kind of answered this already possibly, but the fact that you recognize her to be your brother's nanny, did that make you automatically believe her more because she's a witness and was a nanny to your brother?

[Juror No. 204]: No, not necessarily.

[Asst. Prosecutor]: Did it make you automatically believe her less because of that?

[Juror No. 204]: No.

[Asst. Prosecutor]: Okay. That's all I have, Your Honor.

[Court]: [Defense counsel]?

5

[Defense counsel]: The fact that she is your brother's nanny, and you've had conversations with her, do you believe she is more truthful than any other witness? You know what I'm saying?

[Juror No. 204]: No.

[Defense counsel]: Is she still on the same level as anyone else who's been on the stand or will take the stand?

[Juror No. 204]: Correct.

[Defense counsel]: Then I have no questions, Your Honor.

[Court]: All right.

[State]: Is she still in that status with your brother?

[Juror No. 204]: No and hasn't been for years.

[State]: Okay. That was the only thing. I didn't know if it was the same status or not. So you wouldn't anticipate having any other contact or conversations with her?

[Juror No. 204]: No, just a weird coincidence.

[State]: Okay.

[Court]: All right. Sir, you can step back out into the hallway. Does anybody have any motions?

[Asst. Prosecutor]: None from the State, Your Honor.

[Court]: None from the Defense?

[Defense counsel]: Let me check with my client because I don't want a 2255.

[Court]: Okay. Go ahead and ask your client. (Off the record.) (Proceedings held outside of open court.)

[Defense counsel]: I just spoke with my client, and he's asking me to make a motion to have him dismissed as a juror.

[Court]: Okay, I'm going to deny that because I think he's made it clear that the testimony of that witness will not be treated any differently. As [the State] elicited, that woman is no longer working for the brother, so I don't think that there is any conflict. So I will deny that motion.

6

On the third day of trial, the attorneys again approached the judge for a sidebar and the following conversation took place:

> [Defense counsel]: I'm sorry, Your Honor. My client has asked me to, I guess, ask again that that the juror from yesterday who said that he knows the witness because she was his nanny, he would like him to be excused, and I just want to put it on the record.
>
> [Court]: Just to correct that, the witness was not his nanny. It was his brother's nanny years ago, and that will be denied, again.

After the evidence was closed, the following conversation took place on the record:

> [Court]: We are here, on the record, out of the presence of the jury. The bailiff came to The Court and the attorneys to inform them of an encounter while she was bringing in the Defendant to the courtroom this morning. He was in handcuffs and accompanied by two bailiffs, and the bailiff told us that when they were walking down the hall, there was a juror number 204 who was in the hallway on his phone.
>
> [Bailiff]: No, he was getting off of the elevator, and I stepped in-between, behind the Defendant, acting as if I was speaking to the other deputy and he just walked right in, but I informed you of the situation that just happened.
>
> [Court]: Okay, so you were in-between the Defendant and the juror?
>
> [Bailiff]: Yes.
>
> [Court]: Okay, and anything else somebody wants to put on the record about this?
>
> [State]: Judge, we would just note that the such inadvertent contact and/or passing glance or glimpse is insufficient grounds for any kind of prejudice to the Defendant or advantage to the State in any way in the perception of the jurors since case law clearly shows that such inadvertent [sic] is not grounds to dismiss and/or for mistrial.
>
> [Court]: All right. Mr. Sims, anything you want to put on the record?
>
> [Defense counsel]: Yes, Your Honor. I would like to put on the record that this is the same juror that we asked be dismissed.
>
> [Court]: Yes, this is the same juror you asked to be dismissed for the nanny.

[Defense counsel]: For the nanny so, we repeat -- we again ask that this juror be dismissed. We have an alternate available who's been very attentive during the trial, and we feel that it's better to err in caution.

[Court]: Okay, and just, [] bailiff, one more time. So I understand, it would have been a bailiff, then the Defendant, and then you in that order, and then he walked in through the hallway up the stairs?

[Bailiff]: Right. He was on the south side of that hallway getting off of the elevator walking to the north side. We were already off, so when he got off the elevator and I noticed he was getting off the elevator, he was looking down, so that's when I stepped over, like this, behind the Defendant and acted like I was talking to the other bailiff. As he passed me, I just turned with him.

[Court]: Okay, understood. So The Court finds that first of all, it sounds like while they saw each other outside of the elevator, it sounds like the bailiff would have been blocking him and any view of the handcuffs. I'm reading a case that the State provided. It says, "A brief inadvertent exposure to the jury of handcuffed Defendant while being taken from one place to another does not deprive him of a fair trial." At this time The Court is satisfied that there is still no prejudice, and so we'll keep the jury as it is at this point. All right. We are off the record.

### *Standard of Review*

The trial court is in the best position to determine a juror's ability to effectively discharge his or her duties, and substitution of a juror during trial is a matter entrusted to the trial court's discretion. *State v. Williams*, 427 S.W.3d 259, 264 (Mo. App. E.D. 2014) (citing *State v. Rose*, 169 S.W.3d 132, 134 (Mo. App. E.D. 2005)). This court will not disturb a trial court's ruling regarding the substitution of an alternate juror for a regular juror during trial, absent an abuse of that discretion. *Id.* The trial court abuses its discretion when its ruling is "clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *Id.* at 266.

*Analysis*

Section 494.485, RSMo (2016)[2] provides for the selection of jurors and alternate jurors for trial. In part, it mandates, "Alternate jurors, in the order in which they are called, shall replace jurors who, prior to the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." *Id.*

Appellant contends that the trial court abused its discretion when it denied the defense's request to replace Juror No. 204 three times. Appellant argues this case is like *State v. Brusatti*, in which the court upheld the trial court's substitution of a juror with an alternate after a juror informed the court the detective who testified was her cousin. 745 S.W.2d 210, 211 (Mo. App. E.D. 1987). However, in *Brusatti*, the juror said she had heard "bad things" about the way he conducted himself, but she would "try" to be objective and give each side a fair trial. *Id.* The court found the trial court's action in substituting the juror with the alternate was justified under Section 494.065[3] in that "[t]he record show[ed] the possibility of bias and prejudice against one of the parties." *Id.* at 213. The court noted in close cases, the "better practice" was to sustain a motion to strike for cause, even with the court's wide discretion on challenges for cause during voir dire. *Id.* However, this was not a close case. Juror No. 204 made no mention of anything good or bad about the person he recognized, but merely disclosed he "knew" her and could still be fair. The record reflects the trial court carefully considered Juror No. 204's response and was satisfied he would perform his duties without bias or prejudice.

This case is similar to *State v. Ervin*, in which the Missouri Supreme Court held the trial court did not err in denying a motion to strike a juror for cause who had known one of the victims thirty-five years earlier and was acquainted with a witness who was a highway patrol

---

[2] All statutory references are to RSMo (2016) unless otherwise indicated.
[3] This was the previous version of the statute, which was repealed and replaced by Section 494.085.

officer. 835 S.W.2d 905, 915-16 (Mo. banc 1992). The court found the venireperson was unequivocal in showing the court that he could judge the case fairly and without prejudice in stating that this remote acquaintance would not affect his ability to serve as a fair and impartial juror, or evaluate the officer's testimony differently than any other witness. *Id*. at 916. Similarly, here, Juror No. 204 was a distant acquaintance, who had not been his brother's former nanny for years. Juror No. 204 did not anticipate having any other contact or conversations with her, did not think he would find her testimony any more truthful than other witnesses, and did not have any concerns about being fair to both sides. The trial court was justified in believing this juror and finding he was willing and able to carry out his duties without bias or prejudice. The trial court did not abuse its discretion in denying Appellant's motion to replace the juror with the alternate.

Appellant argues the trial court's failure to grant defense counsel's request to substitute the alternate juror was compounded when Juror No. 204 "likely" saw Appellant in handcuffs while being transported to the courtroom.[4] However, Appellant's point on appeal first alleges the juror "saw" him in shackles, but his argument later equivocates that he "may have seen" the defendant in handcuffs, and then "might have seen" him being transported to the courtroom in handcuffs, and finally, "likely saw" Appellant in handcuffs while being transported to the courtroom. While Appellant did not make a record by asking the juror specifically whether he saw Appellant during this encounter, the court found from the bailiff's testimony that "the bailiff would have been blocking him and any view of the handcuffs." However, the court also

---

[4] In response, the State argues this point is "multifarious" in challenging several claims, does not comply with Rule 84.04(d) and 30.06(c), preserves nothing for appeal, and is subject to dismissal. "Though we may choose to not address a multifarious point, we prefer to decide cases on their merits." *Crisp v. Missouri Sch. For Deaf, Dep't of Elementary & Secondary Educ.*, 681 S.W.3d 650, 659 (Mo. App. W.D. 2023). We exercise our discretion and address the merits of Appellant's point here.

10

considered even if the juror had seen Appellant, a "brief, inadvertent exposure of the jury to a handcuffed defendant while [the] defendant is being escorted from one place to another does not deprive [the] defendant of a fair trial." *State v. Swopes*, 343 S.W.3d 705, 710 (Mo. App. W.D. 2011) (internal quotation omitted).

The trial court heard and clearly considered all the evidence related to Juror No. 204 after Appellant's first motion to remove him and substitute with the alternate juror, as well as Appellant's second and third motions to do the same. The court was satisfied that Juror No. 204 had a distant acquaintance with the witness he recognized, did not even recognize her by name, and would still be fair as a juror. Upon the third motion and the additional occurrence that Juror No. 204 "might have" seen Appellant in handcuffs on his way to the courtroom, the trial court carefully considered the bailiff's testimony that Appellant was blocked, but, even if Juror No. 204 saw Appellant being transported, it would not deprive him of a fair trial. We find the trial court did not abuse its discretion because denying Appellant's requests to substitute Juror No. 204 was not "clearly against the logic of the circumstances and [] so unreasonable as to indicate a lack of careful consideration." *Williams*, 427 S.W.3d at 266 (citing *State v. Forrest*, 183 S.W.3d 218, 223 (Mo. banc 2006)). Appellant's first point is denied.

**Point II**

Appellant's second point alleges the trial court plainly erred in not *sua sponte* ordering the jury to disregard the state's repeated rebuttal closing argument remarks that Appellant was a "serial killer" making his first "thrill kill." Appellant contends the prosecutor's argument was highly prejudicial and inflammatory, argued facts not in evidence, unfairly demeaned him, and encouraged the jury to convict Appellant out of fear of future dangerousness instead of a

11

determination beyond a reasonable doubt that he was guilty of the charged offenses of murder in the first degree and armed criminal action.

*Relevant Facts*

After all the evidence was presented, the state gave its opening and closing argument, during which the prosecutor had an opportunity to summarize the evidence presented to the jury and explain the elements of first-degree murder, and the difference between that and second-degree murder. He emphasized that the jurors would need to determine whether they believed Appellant was the person driving the car in the video from Victim's cul-de-sac, and whether they believed he had deliberated.

> That it was the Defendant and that's what this is going to come down to, is do you believe the suspect in the video is the Defendant? Well, the Defendant is the one who was driving that car. The Defendant is the one who had the murder weapon with him in that car. The Defendant is the one who had the victim's photo in his phone, along with the news clip, along with text messages posing as someone named Donald. That is not a coincidence.
> Second, that the Defendant knew or was aware that his conduct was practically certain to cause the death of [Victim]. You shoot someone in the face, you can be practically certain. I don't think we need to talk further about it.
> Third, that the Defendant did so after deliberation. Well, what is deliberation? It tells you in the instruction. It means cool reflection upon the matter for any length of time, no matter how brief. Keep in mind because this was a brief interaction. One minute he's pretending to ask for directions. He didn't need directions. "Excuse me, sir. Can you tell me how to get to Union Station from here?" You can consider that when you're considering whether he acted deliberately. Whether he knew what he was doing.
> ***
> And if you find and believe from this evidence beyond a reasonable doubt all of those elements that I just described to you, the law requires that you find him guilty. Guilty beyond a reasonable doubt. What does that mean? It means that you are firmly convinced of the evidence beyond a reasonable doubt. Proof beyond a reasonable doubt is proof that leaves you firmly convinced of everything the State has provided to you. It firmly convinces you of the Defendant's guilt as to this matter.
> So what's the difference between murder first and murder in the second-degree? Well, murder in the second-degree is if you don't believe that it was after deliberation, okay? That's the only difference. Murder first is that he did so after deliberation. Murder second, that is not a requirement, and I want you to focus on

12

that. I want you to keep that in mind. After deliberation. What does it mean? Cool reflection upon the matter for any length of time, no matter how brief.

[Victim] had just gotten home. He backed into his parking spot, was walking up to his house for the day. The Defendant got out of his car that was parked across the cul-de-sac, walked towards him pretending to need directions. Poor Don, the helpful person that he was trying to be, and you saw the video. He turned around and started saying, "Yeah, you go out this way, take a right, take another right on Ivanhoe." That's where it cuts off. Why did the Defendant pretend to need directions? He went over there for a reason. He knew what he was doing. Keep that in mind. That's deliberation.

\*\*\*

Defense counsel then made his closing argument on behalf of Appellant, arguing that the person in the video was too short to be the Appellant and that the evidence had been tampered with so they could not find beyond a reasonable doubt that they had the murder weapon. He said Appellant was set up with the picture on his phone, and the car in the videos was never clear enough to see a license plate. He said there was no evidence of cool deliberation because the camera cut off.

Everything that they have brought to you in this trial, there is something wrong with it. There is a problem with it, and they want to say that it's a small thing. It's not a big thing. You can ignore it. Just find him guilty because we say so. We tell you what to do. No, that's not how it works. That's not how it works. In this court, you are at the fact finders. You determine what happened. You must be firmly convinced that this short person, person shorter than me, grew over a foot. That's what they said. That's what you got to believe. He grew over a foot since that day. I'm not asking you to believe anything I say. I'm asking you to believe your eyes. I'm saying look at that video. Look at the pictures. You asked well, is his voice particularly high? You heard him in the interview. The only time his voice went up was when he got excited because they start talking about, "Oh, we got you on a murder." I don't know about you but that would kind of make me excited to know that all of a sudden I, who have been cooperating with the police –
\*\*\*

The prosecutor then had a final chance to argue the state's case, especially emphasizing deliberation:

. . . I handle a lot of homicides, and I think the biggest question that's probably sitting in your mind is why? And I don't have to prove that, but I want to address

13

it because it does go to a material element, and that's deliberation. And I tell you that because there was deliberation. What's unusual about this case -- what is so, I think, equally as disturbing as this case is the methodical way about which [Appellant] did this.

In our world, when **serial killers**, like any a flood, it all starts with a single drop of water. They keep tokens. They keep tokens. This picture, that video. The fact, without provocation, without argument, without fight, without motive of robbery, because nothing was taken. **This was a thrill kill**. This was the beginning. Maybe we caught it at the right time? Thank God for that, but unfortunately for [Victim], and he took and kept tokens. And what is equally as disturbing is the fact that he supplanted his identity within the course of his own conduct in trying to buy another gun. He took on the identity of the victim. The first victim, [Victim], and when someone asks you who they are, you said Donald. That's a token, and that goes to something more deeper and much more disturbed.

You shot him right in the face. That's killing. What you are doing when you're walking over here is you're stalking your prey. You're trying to find the best victim. You're trying to find the best moment. Where does he go? He goes to a cul-de-sac where traffic is not coming and going, where this man is cornered. Where he can't get away. Can't go anywhere. There's nobody who's going to be driving by to see. You've picked your place. You've picked your person, and you've been very specific about it.

One of the things [defense counsel] wants you to do is pay attention to detail. What was left at the scene? A Blazer Luger 9-mm. What was found in his gun unspent? A Blazer Luger 9-mm. This is a murder in the first-degree case, and it's always been that, and we encourage you to **really consider the fact that this man had a thrill kill and went to find his first victim.** What he didn't count on is today's electronic age. You can't Airdrop a video or picture from a previous day a month later. That doesn't happen in this world. You downloaded that the day after when the news broadcast came on, and that's what it said. The next day.

People don't take pictures of their victims unless their intent was to kill somebody because now you have a token of your murder. You have something, a trophy, to take away. That's why this is a murder in the first-degree case. And yes he's young and yes he's 18, but guess what? You can kill at any age, and you can develop the persona about what you want to do, and you can see that reflected as he stalked the neighborhood to find the right place, the right time, the right moment and unfortunately, the right victim. You don't fight him. You don't steal from him. You shoot him in the face. Ladies and gentlemen, **this was a thrill kill**. On behalf of the [Victim's] family, on behalf of the State of Missouri, I thank you. Thank you very much.

(emphasis added). Appellant did not object to this argument.

14

*Standard of Review*

Appellant alleges the trial court plainly erred because the errors were not preserved. Pursuant to Rule 30.20,[5] in our discretion we may review plain errors affecting substantial rights if we find the alleged errors resulted in a manifest injustice or miscarriage of justice. The first step is to determine whether the claim of error facially establishes substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009) (internal citations omitted). To grant plain error relief, there must be error that is evident, obvious, and clear. *State v. Schneider*, 678 S.W.3d 493, 502 (Mo. App. E.D. 2023) (internal quotations omitted). If plain error is found, the court must proceed to the second step and determine whether the claim of error resulted in manifest injustice or miscarriage of justice. *Baumruk*, 280 S.W.3d at 607-08. Plain error can serve as a basis for granting a new trial on direct appeal only if the error was outcome determinative. *State v. Baxter*, 204 S.W.3d 650, 652 (Mo. banc 2006) (quoting *Deck v. State*, 68 S.W.3d 418, 427 (Mo. banc 2002)).

Plain error is rarely found in closing argument, and reversal is warranted only if the defendant shows the improper argument "had a decisive effect on the jury's determination . . . . The entire record is considered when interpreting a closing argument, not an isolated segment." *State v. Reeves*, 708 S.W.3d 168, 173 (Mo. App. S.D. 2024) (internal quotation omitted). "[T]he failure to object during closing argument is more likely a function of trial strategy than of error." *State v. Tisius*, 362 S.W.3d 398, 409 (Mo. banc 2012). It is reasonable trial strategy to refrain from objecting when an objection to a prosecutor's comment would draw additional, unwanted attention to the statement. *Shockley v. State*, 579 S.W.3d 881, 914 (Mo. banc 2019) (internal

---

[5] All references to Rules are to Missouri Supreme Court Rules (2023).

15

citation omitted). Thus, a court taking uninvited action may emphasize the matter in a way the defendant chose not to do. *State v. Perry*, 275 S.W.3d 237, 245, 248 (Mo. banc 2009) (even where the prosecutor's words were inappropriate, without objection from the defense counsel, the appellate court could not find plain error in the trial court's failure to *sua sponte* interrupt closing argument and draw attention to the statement by striking it and admonishing the jury to disregard it).

## *Analysis*

Appellant argues the prosecutor's rebuttal closing argument, that he was a "serial killer" making his first "thrill kill" was highly prejudicial and inflammatory, as to establish substantial grounds that a manifest injustice or a miscarriage of justice occurred in this case. However, the state has wide latitude in closing arguments, so long as it does not go beyond the evidence presented. *State v. Deck*, 303 S.W.3d 527, 543 (Mo. banc 2010). Statements that misrepresent the evidence or the law, introduce irrelevant or prejudicial matters, or otherwise confuse the jury should be excluded. *Id*. Counsel may draw non-evidentiary conclusions in closing argument if those conclusions are fairly justified as a matter of inference from the evidence. *West v. State*, 244 S.W.3d 198, 202 (Mo. App. E.D. 2008) (quoting *State v. Bailey*, 526 S.W.2d 40, 43 (Mo. App. 1975)). A prosecutor may retaliate to an issue raised in the defendant's closing argument even if it would be otherwise improper. *State v. Matchett*, 69 S.W.3d 493, 500 (Mo. App. S.D. 2001).

Appellant relies on *State v. Banks*, in which the Missouri Supreme Court reversed the defendant's murder and armed criminal action convictions due to the prosecutor's statement, "when the scene is set [in hell] and we have to go and catch the Devil, there are no angels as witnesses. This is Hell. He is the Devil . . . . He is guilty beyond a reasonable doubt." 215

16

S.W.3d 118, 119, 122 (Mo. banc 2007). The trial court overruled the defense counsel's objections to the argument as improper, intentional and an unfair analogy, but the Supreme Court disagreed because the state "point[ed] to no evidence that [the defendant] was in fact the devil and the crime scene was hell." *Id*. at 121. Thus, it found "[t]he remark was pure hyperbole, an ad hominem personal attack designed to inflame the jury." *Id.*

Appellant also argues *State v. Whitfield*, applies, where the Missouri Supreme Court discussed the prosecutor calling the defendant a "mass murderer" four times and a "serial killer" three times during the closing argument. *State v. Whitfield*, 837 S.W.2d 503, 513 (Mo. banc 1992). The *Whitfield* court described the terms "mass murderer" and "serial killer," as "pejorative names associated with a small ghoulish class of homicidal sociopaths who repeatedly and cruelly murder for no apparent motive than to satisfy a perverse desire to kill or cause pain," but also found the evidence against the defendant did not support such terms and their meanings. *Id.* The Court warned that the state should avoid such argument on remand, as the objections at trial should have been sustained. *Id.* However, while the court found "[c]omments designed solely to inflame jurors against the defendant by associating him with heinous crimes not in the record is always error," it stated such comments were not always reversible error, and avoided making such determination in *Whitfield* because the case was reversed on other grounds. *Id.*

We distinguish both *Whitfield* and *Banks*. First, error was preserved in those cases by the defendants' objections at trial, but here, Appellant did not object to the prosecuting attorney's use of "serial killers" or "thrill kill." Second, the Supreme Court recognized there was no evidence to support the terms in either case because the analogy describing the defendant as the devil in hell in *Banks*, nor the definitions of "mass murderer" or "serial killer" in *Whitfield* were supported by the evidence. Such is not the case here. The prosecutor used the term "serial

17

killers" in general terms once while setting up his argument without referring specifically to Appellant. The prosecutor did use the term "thrill kill"[6] three times as he was describing the evidence that supported using the term in connection with Appellant: Appellant stalked his prey to find what he thought was the best place, moment, and victim; he shot his victim in the face without stealing from him or fighting him; and Appellant kept tokens of the murder and even supplanted his identity with that of the victim.

Without evidence of another motive, we find the prosecutor here attempted in good faith to explain the Appellant's motivation to kill Victim in response to Appellant's argument that there was no cool deliberation. As in *Whitfield*, use of the term "serial killer" is error but not always grounds to reverse as here where the prosecutor was "walking the precipice of reversible error" but remained on "the cliff's edge" and out of the "abyss." *See State v. Moore*, 352 S.W.3d 392, 404 (Mo. App. E.D. 2011) (quoting *State v. Perry*, 689 S.W.2d 123, 126 (Mo. App. W.D. 1985)) (finding prosecutor did not "drift[] a bit too close to the cliff's edge" but rather "flung himself headfirst into the abyss" where he improperly adduced and argued evidence of the defendant's prior convictions as propensity evidence). As a result, we find the context in which the prosecuting attorney used these terms was not so inflammatory and prejudicial they changed the outcome of trial and required the court to *sua sponte* take corrective action. In fact, given no objection was raised, it can be reasonably inferred the failure to do so was sound trial strategy to avoid drawing the jury's attention to the prosecutor's argument, rendering judicial intervention inappropriate. Neither *Banks* nor *Whitfield* demonstrate we should find otherwise.

---

[6] A thrill kill is considered a premeditated or random murder that is motivated by the sheer excitement of the act. MacKenzie, Doris Layton; O'Neill, Lauren; Povitsky, Wendy; Summer Acevedo (2010-05-28). <u>Different Crimes, Different Criminals: Understanding, Treating and Preventing Criminal Behavior</u>. Routledge. pp. 217-19. ISBN 9781437755428.

More than sufficient evidence was presented at trial to support the jury's verdict without consideration of terms like "serial killer" or "thrill kill." *See State v. Baller*, 949 S.W.2d 269, 272 (Mo. App. E.D. 1997). The murderer and his vehicle were captured on home doorbell video and neighbors witnessed the vehicle speeding away. A month later, a police officer noticed the distinctive vehicle he had been searching for in the same area where the murder had occurred and the license plates did not match the vehicle. When Appellant was detained, he admitted he was the only driver of the vehicle, which was seen on video parking at his home shortly after the murder took place, about the same time it would have taken him to drive home from Victim's home. He had the murder weapon in his waistband and the serial number was painted over. The weapon was ready to fire with a bullet of the same caliber that killed Victim in its chamber. Cell phone data placed Appellant in the area of the murder in the time frame preceding the murder. Appellant's phone also had a news report downloaded about the murder the day after it occurred, and showed text messages days after the murder with Appellant identifying himself by Victim's name, Donald. The prosecutor's argument did not change this evidence and certainly did not change the jury's determination that Appellant was guilty beyond a reasonable doubt. Appellant's second point is denied.

## CONCLUSION

The judgment of the trial court is affirmed.

_____
Lisa P. Page, Judge

Robert M. Clayton III, P.J., and
Michael E. Gardner, J., concur.

19